# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DUNNET BAY CONSTRUCTION COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 10-CV-3051 |
| GARY HANNIG, in his official capacity as Secretary of Transportation for the Illinois Department of Transportation, and the ILLINOIS DEPARTMENT OF TRANSPORTATION, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This matter comes before the Court on Plaintiff Dunnet Bay Construction Company's (Dunnet Bay) Motion to Compel Production by Taxpayers for Quinn (d/e 51) (Motion). For the reasons set forth below, the Motion is DENIED.

## BACKGROUND

On December 4, 2009, the Defendant Illinois Department of Transportation (hereinafter Department or IDOT) issued an invitation for bids on Contract No. 60157 for repair work on the Eisenhower Expressway (Project). The announcement stated that the bids would be let on January

15, 2010.  <u>Second Amended Complaint (d/e 19) (Complaint)</u>, ¶ 31.  The Project was federally funded.  The Department also published the "IDOT For Bid List of Bidders" (List of Bidders) which listed the general contractors that would be expected to bid on the Project.  The Department erroneously omitted Dunnet Bay from the List of Bidders.  <u>Complaint</u>, ¶ 39.

Pursuant to federal regulations, the bid specifications set a goal (DBE Goal) of the percentage of work going to contractors and subcontractors that fit the federal criteria for Disadvantaged Business Enterprises (DBE).  DBEs are businesses controlled by socially and economically disadvantaged individuals.  <u>See</u> 49 C.F.R. §§ 26.5, 26.67; <u>Northern Contracting, Inc. v. Illinois</u>, 473 F.3d 715, 715 (7th Cir. 2007). Dunnet Bay did not fit the definition of a DBE.  Dunnet Bay, thus, had to secure DBE subcontractors to meet the DBE Goal.

Dunnet Bay alleges that the DBE Goal for the Project was 8 percent originally, but was changed to 22 percent.  Dunnet Bay alleges that the increase to 22 percent was arbitrary and capricious and was not done in compliance with federal regulations.  <u>Complaint</u>, ¶¶ 32-36.

Dunnet Bay submitted the low bid on the Project in the amount of $10,548,873.98.  Dunnet Bay alleges that it made a good faith effort, but could not meet the 22 percent DBE Goal.  <u>Id.</u> ¶ 39.  The Department

rejected Dunnet Bay's bid as non-responsive because of the failure to meet the DBE Goal. Id. ¶ 42.

Dunnet Bay asked for reconsideration because it alleges that it had made a good faith effort. The applicable regulations stated that the Department would issue a waiver of the DBE Goal requirement if the bidding contractor made a good faith effort to meet the DBE Goal set for the particular project. Id. ¶¶ 13, 19.

Dunnet Bay alleges that the Department instituted an unwritten policy not to issue waivers regardless of whether contractors made good faith efforts to meet a DBE goal (No Waiver Policy). On January 6, 2010, the Department's District 8 EEO officer announced at an informational meeting for general contractors that the Department would no longer grant waivers with respect to DBE contract goals. Id. ¶ 24. Defendant Hannig personally told Dunnet Bay's President Tod Faerber that he was under pressure not to give out waivers. Hannig further told Faerber that Darryl Harris, the Illinois Director of Diversity Enhancement, called the Secretary every day to tell him not to give out any waivers. Id. ¶ 47. Dunnet Bay alleges that the No Waiver Policy effectively turned the DBE Goal into an unlawful quota. Id. ¶ 51.

The Department's Chief of Staff Bill Grunloh conducted the reconsideration hearing. The Department denied reconsideration. Hannig

sustained the decision. Dunnet Bay alleges that the Department denied reconsideration because of the No Waiver Policy. Id. ¶¶ 44, 49-50.

The Department, however, decided to re-let the bids for the Project because Dunnet Bay was left off the List of Bidders. Id. ¶¶ 48, 51. This time, however, Dunnet Bay was the third lowest bidder. Id. ¶ 53. The Complaint alleges that Department is preparing to go forward with the lowest bid. Id. ¶ 54; see Opinion entered March 26, 2010 (d/e 15), at 6 (evidence submitted in connection with motion for a temporary restraining order indicated that the Department intended to enter into a contract on April 5, 2010, with the lowest bidder, Albin Carlson & Co).

Based on these allegations, Dunnet Bay brings claims under 42 U.S.C. §§ 1981 and 1983 against Hannig in his official capacity for injunctive relief (Counts I and II); claims against the Department under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, for injunctive relief and damages (Counts IV and V); and a state law claim against the Department under the Illinois Civil Rights Act of 2003, 740 ILCS 23/5, for damages (Count VI).[1]

On February 8, 2011, Dunnet Bay served Respondent Taxpayers for Quinn (Taxpayers) with a Subpoena to Produce Documents (Subpoena).

---

[1] Count III of the Complaint was dismissed as duplicative of Count II. Opinion entered October 6, 2010 (d/e 30), at 2.

Taxpayers is Illinois Governor Patrick Quinn's political campaign committee.

The Subpoena commanded the production of the following documents:

### DOCUMENTS, OBJECTS AND TANGIBLE THINGS REQUESTED

1. All documents reflecting, referring or relating to any analysis of the advantages or disadvantages to Governor Quinn's candidacy for governor of potential or actual changes in the policies or administration of IDOT's DBE program.

2. All documents reflecting, referring or relating to any communications sent by the Committee to any person, association or organization urging support for Governor Quinn's candidacy for governor based upon any one of the following:

    A. Changes in the policies or administration of IDOT's DBE program;

    B. The implementation of a no waiver policy with respect to IDOT's DBE program;

    C. The implementation of a no waiver policy with respect to any state minority or female contracting program;

    D. The increased opportunities for minorities to contract with the state; or

    E. The increase in minority contracting with the state.

3. All documents reflecting, referring or relating to the role, participation or assignment of Darryl Harris with respect to Governor Quinn's campaign for governor.

4. All documents reflecting, referring or relating to the article that appeared in the January 2010 edition of the Capital City Courier magazine entitled: "Darryl Harris: Dealing Minority-Owned Businesses In!"

5. All documents reflecting, referring or relating to IDOT's DBE program or the administration of that program.

6. All documents reflecting, referring or relating to the DBE goals for any or all IDOT projects.

7. All documents reflecting, referring or relating to any communications between anyone in Governor Quinn's office and the political committee, Taxpayers for Quinn, concerning any of the following subject matters:

    A. IDOT's administration of the DBE program.

    B. The proposed or actual DBE goals for any IDOT project or contract.

    C. The IDOT projects proposed in 2009 or 2010 involving the resurfacing of I-290 between Austin Avenue and I-355.

    D. A proposed or actual no waiver policy implemented or to be implemented at IDOT with respect to contractor's requests for adjustment to, or to be excused from meeting, IDOT's DBE goals.

    E. A proposed or actual no waiver policy implemented or to be implemented at any state agency other than IDOT with respect to goals for minority or female contracting programs.

    F. The activities of Darryl Harris.

    G. The article that appeared in the January 2010 edition of the Capital City Courier magazine entitled: "Darryl Harris: Dealing Minorities In."

    H. IDOT DBE goals for any or all projects.

    I. This Lawsuit.

Motion, Exhibit A, Subpoena, Rider to Taxpayers for Quinn Subpoena, at 4-6.

Taxpayers agreed to produce communications between Taxpayers and the Office of Governor and communications between Taxpayers and the Department, but objected to internal Taxpayers documents.  Taxpayers claimed that internal documents were privileged under the First Amendment.  Dunnet Bay and Taxpayers attempted to resolve the dispute, but could not.  Dunnet Bay has filed this Motion to compel Taxpayers to produce the subpoenaed documents.

## ANALYSIS

The supporters of Taxpayers have First Amendment rights to freedom of association to join together to support their candidate for Governor,

> [T]he right of association is a "basic constitutional freedom," that is "closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." In view of the fundamental nature of the right to associate, governmental "action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny."

Buckley v. Valeo, 424 U.S. 1, 25 (1976) (quoting Shelton v. Tucker, 364 U.S. 479, 486 (1960) and National Ass'n for Advancement of Colored People (NAACP) v. State of Alabama ex rel. Patterson, 357 U.S. 449, 460-61 (1958) (internal citations omitted).  Thus, this Court's power to command the production of information may not be used to violate those First

Amendment rights.  NAACP, 357 U.S. at 460-62; see Grandbouche v. Clancy, 825 F.2d 1463, 1466 (10th Cir. 1987) (First Amendment privilege applies to discovery disputes between two private parties).

The First Amendment privilege from disclosure in discovery has been extended to protect against the disclosure of the identity of members and the content of internal communications between members, employees, and agents of political campaigns.  See Perry v. Schwarzenegger, 591 F.3d 1147, 1162-63 (9th Cir. 2010).  The privilege protects the First Amendment rights of individuals to associate with each other and to speak as a group.  The concern is that disclosure will inhibit the exercise of First Amendment rights.  Sometimes disclosure of the identity of the members of the association will subject members to harassment and intimidation because the association advocates a controversial view.  E.g., NAACP, 357 U.S. at 462.  Sometimes disclosing internal communications may inhibit supporters and campaign staff from participating in advocacy activities and from exchanging ideas freely and openly.  See Perry, 591 F.3d at 1162-63; Wyoming v. U.S. Dept. Of Agriculture, 208 F.R.D. 449, 454-55 (D.D.C. 2002) (disclosure of internal communications, "would have a potential 'for chilling the free exercise of political speech and association guarded by the First Amendment.'" (quoting Federal Election Commission v. Machinists Non-Partisan Political League, 655 F.2d 380, 388 (D.C. Cir. 1981)).

The First Amendment privilege, however, is not absolute. The courts have an interest in uncovering the truth and providing a resolution to the parties. See Deitchman v. E.R. Squibb & Sons, Inc., 740 F.2d 556, 561 (7th Cir. 1984). Taxpayers must first make a prima facie showing that compliance with the subpoena, "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." Perry, 591 F.3d at 1160 (quoting Brock v. Local 375, Plumbers Intern. Union of America, AFL-CIO, 860 F.2d 346, 350 (9th Cir. 1988)); accord, In re Motor Fuel Temperature Sales Practices Litigation, 641 F.3d 470, 488 (10th Cir. 2011). If Taxpayers makes this showing, then Dunnet Bay must show that the information is essential to its case and could not be obtained by other means that would be less likely to discourage such advocacy. United States v. Citizens State Bank, 612 F.2d 1091, 1094
(8th Cir. 1980).

Taxpayers submitted the declarations of Holly Copeland and Cheryl Byers. Taxpayers for Quinn's Response to Plaintiff's Motion to Compel Production of Documents (d/e 55) (Response), Exhibit A, Declaration of Holley Copeland (Copeland Declaration), and Exhibit B, Declaration of Cheryl Byers (Byers Declaration). Copeland was the Political Director of

Taxpayers from September 2008 through February 2010, and Chief Operating Officer of Taxpayers from March 2010 through August 2011. Copeland Declaration, ¶1.  Byers has been the Political Director of Taxpayers since June 2011.  Byers Declaration, ¶1.

Copeland states that, in her experience, internal communications in a campaign must be free flowing and uninhibited to insure that diverse points of view are considered.  This flow of information and opinions would be stifled if they were subject to disclosure.  She states that she would not have expressed herself freely if she knew that her statements would have been disclosed.  She states that she fears she would be the subject of attacks on Internet blogs and other media.  She states that during the campaign she was subjected to harassing phone calls because of her position in the campaign.  She states that disclosure would subject her to more such harassment.  She further states that she intends to volunteer at Taxpayers, but she will not offer her candid advice and opinions if those statements would be subject to disclosure.  She also states that, based on her experience, she believes other staff and volunteers will not communicate candidly if their statements are disclosed.  Copeland Declaration, ¶¶ 5-7.

Byers states internal communications within Taxpayers are confidential, and as a result, Byers felt free to offer her opinions and

thoughts on campaign strategy. If she knew that her statements would be subject to disclosure, she would not have shared her thoughts freely. She stated that she did not want her candid thoughts and opinions scrutinized by others. She states that she would be subjected to personal attacks on Internet blogs and other media by those holding opposing views. She further states that staff and volunteers would not speak freely if they knew that their communications would be subject to disclosure. Byers Declaration, ¶¶ 4-8.

Such declarations are sufficient to make out a prima facie showing for asserting the First Amendment privilege in this case. The Seventh Circuit has not addressed the issue directly, but other Courts of Appeals have found similar affidavits to be sufficient to make a prima facie showing. See Perry, 591 F.3d at 1163; American Federation of Labor and Congress of Indus. Organizations v. Federal Election Com'n, 333 F.3d 168, 177 (D.C. Cir. 2003); Dole v. Service Employees Union, AFL-CIO, Local 280, 950 F.2d 1456, 1458-60 (9th Cir. 1991); see also United States v. Citizens State Bank, 612 F.2d 1091, 1094 (8th Cir. 1980).

The Perry decision seems particularly applicable here. The Perry decision also concerned efforts to discover the internal communications of a political campaign committee. The campaign committee in Perry ran the successful initiative campaign to amend the California constitution to

provide that "only marriage between a man and a woman is valid or recognized" in the state. Perry, 591 F.3d at 1152. The Perry Court found declarations from staff members of the campaign similar to those submitted here to be sufficient to make out a prima facie showing, in part, because of the importance of protecting the First Amendment right to direct participation in the political process though political campaigns,

> Although the evidence presented by Proponents is lacking in particularity, it is consistent with the self-evident conclusion that important First Amendment interests are implicated by the plaintiffs' discovery request. The declaration creates a reasonable inference that disclosure would have the practical effects of discouraging political association and inhibiting internal campaign communications that are essential to effective association and expression.

Perry, 591 F.3d at 1163.

It is true that the underlying issue in Perry (to amend the state constitution to only recognize marriage between a man and a woman) was very controversial. It is also true that other cases that applied the First Amendment privilege have sometimes involved controversial topics. E.g., Dole, 950 F.2d at 1459 (controversial political issues). Dunnet Bay, however, also raises controversial allegations of racial discrimination and the illegal use of quotas. The Taxpayers staff, volunteers, and other supporters have the First Amendment right to associate with like-minded individuals to articulate their views concerning these issues as part of their

efforts to promote their candidate for office.  See Perry, 591 F.3d at 1159 ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." (quoting NAACP, 357 U.S. at 460)). The declarations before the Court show that disclosure of private internal communications among Taxpayers staff, volunteers, and supporters would have a chilling effect on their rights by discouraging them from communicating candidly.  Taxpayers has made out a prima facie showing to assert the First Amendment privilege.

Because Taxpayers has met its initial burden, Dunnet Bay must demonstrate the information sought by the Subpoena is necessary to its case and cannot be secured by other means that are less likely to affect First Amendment rights.  Perry, 591 F.3d at 1161.  In weighing these concerns, the Court must consider the relevance of the information sought, the Plaintiffs' need for the information, and the impact of disclosure on First Amendment rights.  See In re Heartland Institute, 2011 WL 1839482, at *3 (N.D. Ill. 2011).  In this case, the information sought may be relevant to show that Governor Quinn pressured or directed Hannig and the Department to adopt the No Waiver Policy.

Dunnet Bay, however, has not shown that the relevant information could not be obtained by other means that would be less likely to affect First Amendment rights.  The relevant evidence would show the alleged pressure

on (or directions to) Hannig and the Department to implement the No Waiver Policy. The evidence of pressure or direction would be found in the communications made to Hannig and the Department. Taxpayers had agreed to produce all responsive communications with the Department and the Governor's Office. Furthermore, the Complaint identifies several individuals who allegedly have personal knowledge of the No Waiver Policy, including Hannig, his Chief of Staff Grunloh, and Darryl Harris. Dunnet Bay can depose all of these individuals to discover the relevant information. Given the availability of the relevant information from these sources, Dunnet Bay has not shown the requisite need to overcome the concerns of the chilling effect of production on the First Amendment rights of the staff, volunteers, and supporters of Taxpayers. The Court, therefore, sustains the First Amendment objection of Taxpayers to the Subpoena. The Motion is denied.

Dunnet Bay argues that Taxpayers failed to meet its initial burden to invoke the First Amendment privilege. Dunnet Bay argues that Taxpayers must present objective facts that the discovery will result in a chilling of the proponent's associational rights. <u>Memorandum of Law in Support of Dunnet Bay's motion to Compel Taxpayers for Quinn</u>, at 10. The Court finds that Taxpayers has made a sufficient showing that the First Amendment rights of its staff, volunteers, and other supporters are impaired

by Dunnet Bay's Subpoena.  The fundamental issue is what will happen in the future if documents are disclosed.  Taxpayers must present evidence of a reasonable probability of a chilling effect on the First Amendment rights of its staff, volunteers, and supporters.  <u>Buckley</u>, 424 U.S. at 74.  Declarations from staff setting forth the impact of disclosure on their future behavior are sufficient to meet this burden.  <u>See e.g.,</u> <u>Perry</u>, 591 F.3d at 1163; <u>Dole</u>, 950 F.2d at 1458-60.  In light of those cases, and the importance of protecting the First Amendment rights non-parties such as the supporters, volunteers and staff of Taxpayers, the Court finds that the evidence presented here is sufficient to meet the initial burden to raise the privilege.

Dunnet Bay also argues that it has a compelling need for internal campaign documents from Taxpayers.  The Court disagrees.  Taxpayers is not a defendant, and Governor Quinn is not a defendant.  The defendants are Hannig and the Department.  Hannig and the Department are alleged to have implemented the illegal No Waiver Policy quota system.  The relevant inquiry is the influence of Governor Quinn and Taxpayers on Hannig and the Department to allegedly implement this illegal policy.  The communications with Hannig and the Department, thus, are the primary source of this information, not the Taxpayers' internal documents.  Taxpayers will produce its responsive communications with the Department

and the Office of the Governor.  Dunnet Bay has not shown a compelling need for Taxpayers privileged internal documents.

WHEREFORE, Plaintiff Dunnet Bay Construction Company's Motion to Compel Production by Taxpayers for Quinn (d/e 51) is DENIED.

ENTER:   November 9, 2011

*s/ Byron G. Cudmore*
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE
