## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DUNNET BAY CONSTRUCTION COMPANY, an Illinois Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | NO. 10-3051 |
| GARY HANNIG, in his official capacity as Secretary of Transportation for the Illinois Department of Transportation, and the ILLINOIS DEPARTMENT OF TRANSPORTATION, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

Pending are Cross-Motions for Summary Judgment.

At the end of the day, Defendants prevail.

Here is the background.

## I. INTRODUCTION

In this action, the Plaintiff seeks a declaratory judgment that the Defendant's Disadvantaged Business Enterprise ("DBE") Program discriminates on the basis of race in the award of federal-aid highway construction contracts in Illinois, is unconstitutional and further seeks injunctive relief against enforcement of the

program.

The Plaintiff also seeks damages from the Defendant under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., on the grounds that it was excluded from participation in, denied the benefits of, and subjected to discrimination by the Defendant through its DBE Program in the award of federal-aid highway construction contracts. Additionally, the Plaintiff seeks damages and injunctive relief under the Illinois Civil Rights Act of 2003, 740 ILCS 23/1 *et seq.*

The Plaintiff has filed a Motion for Summary Judgment, asserting that Defendant has departed from federal regulations and the Defendant's own federally-approved written program to experiment with race-based means to achieve ends it thought were advisable or politically expedient. The Plaintiff alleges that Defendant's program is designed to achieve a desirable racial balance. Because it is not narrowly tailored to further a compelling governmental interest, therefore, the Defendant's actions cannot withstand strict scrutiny. Accordingly, the Plaintiff contends it is entitled to summary judgment on the issue of liability.

The Defendant has also filed a Motion for Summary Judgment, alleging that all applicable guidelines were followed with respect to the DBE program. Because it is federally mandated and the Defendant did not abuse its federal authority, it asserts the program is not subject to attack. Moreover, the Defendant claims neither the rejection

of the Plaintiff's bid, nor the decision to rebid the project, was based upon the Plaintiff's race. Because the Plaintiff was not subjected to intentional discrimination based on its race and was not treated less favorably than any other contractor, the Defendant contends there is no Equal Protection violation.

The Defendant further asserts that, because the Plaintiff is relying on the rights of others and was not denied equal opportunity to compete for government contracts, the Plaintiff lacks standing to bring a claim for racial discrimination. Additionally, it contends the Plaintiff is unable to show that, even if there were a violation, it would have been awarded the contract or that an ongoing violation justifies injunctive relief. For all of these reasons, the Defendant contends it is entitled to summary judgment.

## II. FACTUAL BACKGROUND

A. The Parties

Plaintiff Dunnet Bay Construction Company is a corporation organized and existing under the laws of the State of Illinois. Dunnet Bay is engaged in the business of general highway construction. It is a business which is owned by two white males–Tod Faerber and Douglas Stuart. Dunnet Bay has been qualified by the Illinois Department of Transportation ("IDOT" or "the Department") to bid work on IDOT highway construction projects.

From February 2009 through June 30, 2011, Gary Hannig was the Secretary of the IDOT.[1]  In October 2011, Hannig became Special Advisor to Illinois Governor Patrick Quinn and, in December 2011, Hannig became the Director of the Governor's Office of Legislative Affairs.  At all relevant times, Ellen Schanzle-Haskins was Chief Counsel at IDOT.

IDOT is an agency or department of the State of Illinois and is responsible for administering, building, operating, and maintaining the State highway system, including federal-aid highways, receiving and distributing federal financial assistance for highway construction and maintenance, and administering federally funded highway construction contracts in accordance with the laws of the United States and the State of Illinois, including those regulations promulgated by the United States Department of Transportation found in Part 26 of Title 49 of the Code of Federal Regulations.  There are approximately 16,000 miles of highways within the State of Illinois.

For purposes of highway construction and maintenance, the State of Illinois is divided into five regions, which are subdivided into nine districts.  In general, the nine district engineers are responsible for the planning, design, construction, and

---

[1]Hannig is sued in his official capacity, which is another way of bringing an action against IDOT.  *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

maintenance of highways in their respective districts. In terms of organizational structure, the district engineers report to the regional engineers who in turn report to the Director of Highways, Chief Engineer. At the time of the events described herein, Christine Reed was the Director of Highways, Chief Engineer. Reed was responsible for planning, designing, constructing and maintaining approximately 16,000 miles of highways within the State of Illinois and supporting counties and cities with the maintenance of their streets and roads.

B. Awarding Federally Funded Construction Contracts

IDOT awards highway construction contracts, including federally funded highway construction contracts to the lowest responsible and responsive bidder whose bid meets the requirements and criteria set forth in the invitation for bids. A "responsive bidder" is one who has submitted a bid that conforms in all material respects to the invitation for bids.

In general, a procurement for highway construction is initiated by IDOT with the issuance of an invitation for bids and the publication in the Illinois Procurement Bulletin of a public notice of the invitation. Prequalified construction companies interested in competing for a highway construction contract submit sealed bids to the Department. All bids are opened publicly at the designated time and place. IDOT then evaluates the bids based upon the requirements set forth in the invitation for bids

and awards the highway construction contract to the lowest responsible and responsive bidder. The general or prime contractor awarded the construction contract completes the project with the use of subcontractors who perform certain phases or aspects of the construction project with the remainder of the construction "self-performed" by the general contractor.          C. The DBE Program

**(1) Federal requirements**

With respect to federally funded highway construction projects, the Transportation Equity Act for the 21st Century ("TEA-21"), 112 Stat. 107, P.L. 105-178 (1998), as amended by the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, 23 U.S.C. § 101 Note, 119 Stat. 1144, P.L. 109-59 (2005), and the regulations promulgated thereunder, *viz*., 49 C.F.R. §§ 26.21, 26.45, require State recipients of federal-aid funds for highway contracts, in this case, IDOT, to submit to the United States Department of Transportation ("USDOT") a written plan that demonstrates, *inter alia*, that they are not discriminating against minorities and women in the award of contracts. Pursuant to Section 1101(b) of TEA-21, a goal of "not less than 10% of the amounts made available for any program under . . . [TEA-21] shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals." Each state recipient is to set an overall goal for DBE participation in accordance with methods prescribed by USDOT. 49

C.F.R. § 26.45.

After an overall goal is established, a State recipient such as IDOT may use contract goals to meet any portion of the overall goal projected not to be met by race-neutral means. 49 C.F.R. § 26.51(e). In setting individual contract jobs, the State recipient is supposed to consider such factors as the type of work involved, the location of the work and the availability of DBE's for the work of the particular contract. 49 C.F.R. § 26.51(e)(2).

In accordance with the federal regulations (49 C.F.R. §§ 26.21 and 45(f)(1)), IDOT[2] has prepared and submitted to the USDOT for approval a DBE program governing federally funded highway construction contracts.

### (2) IDOT's Aspirational Goal, DBE Liaison and Unified Directory

The statewide attainment of minority participation was 11.2% while the goal was 22.7%. For fiscal year 2010, the Department established an overall aspirational DBE goal of 22.77% for DBE participation for federally assisted construction contracts and projected that 4.12% of the overall goal could be met through race neutral measures and that the remaining 18.65% would require the use of race-conscious goals. IDOT's FFY 2010 overall goal was submitted to the Federal

---

[2]IDOT's authority to obtain federal funds for highway construction and to follow federal law with respect to those funds comes from Section 3-103 of the Illinois Highway Code, 605 ILCS 5/3-103.

Highway Administration ("FHWA") of USDOT on September 16, 2009. IDOT normally achieved somewhere between 10 and 14 percent participation by DBEs. The overall aspirational goal was based upon a statewide disparity study conducted on behalf of IDOT in 2004. There is often a major difference between the aspirational goal and the goal that can be supported on an individual project.

IDOT prepared and submitted to the FHWA on November 24, 2009, a DBE Program Document for FFY 2010, a copy of which is attached as an exhibit to Dunnet Bay's supporting memorandum. Among other things, the IDOT DBE Program Document provides that IDOT "will not use quotas in the administration of this DBE program."

The Department's DBE Program Document designated its Bureau Chief of the Office of Business and Workforce Diversity, Bureau of Small Business Enterprises, as the DBE Liaison officer. The Bureau's duties included: (1) making recommendations on pre and post-award goal modifications; (2) tracking final payments and approving final goal modifications; (3) approving modifications to approved DBE Utilization Plans; and (4) analyzing race-neutral program initiatives. Approval of the EEO officer's DBE goal is not a listed duty.

The IDOT DBE Program further provides for the maintenance of an Illinois Unified Certification DBE Directory which lists certified DBE firms with their name,

address, and contact information by industry or category. "It is the responsibility of the prime contractor consultant to make his/her own determination regarding the capability of a DBE firm. Only those firms certified as of the letting date/bid opening may be utilized in meeting a DBE contract goal."

### (3) Utilization or Contract Goals

Before advertising a construction project, IDOT generally sets goals for individual highway construction projects and estimates the cost of each project. The Program Development Engineer typically develops a general spreadsheet that helps determine the maximum allowable goal based on input from the EEO officer regarding what items could be DBE items.

From 2008 to May 2012, John Fortmann was the Program Development Engineer of the Division of Highways for Region 1 of IDOT. Fortmann wanted to be scientific about setting goals so the goals that are used can be justified.

Each highway construction contract may include a specific DBE utilization goal or contract goal established by the Department for the purpose of meeting its aspirational goal. The utilization goal is incorporated in the invitation for bids for the contract, and "[c]ompliance therewith is deemed a material bidding requirement. The failure of the bidder to comply will render the bid not responsive"

Utilization goals under the IDOT DBE Program Document are determined

based upon "an assessment of the type of work, the location of the work, and the availability of DBE companies to do a part of the work." Specifically, the district's estimating engineer and the district's equal employment opportunity officer ("EEO Officer") review each construction project contract in the district to determine whether the project presents opportunities for DBE participation. Henry Gray, a civil engineer who had been with IDOT for 16 years, was the EEO Officer for District 1 from 2008 until approximately January 2010.

Each pay item for a proposed contract is analyzed to determine if there are at least two ready, willing, and able DBEs to perform the pay item. For a DBE subcontractor to be "ready," that subcontractor must have all its paperwork submitted, it must be certified, and it must be allowed to bid and perform work on IDOT construction. The capacity of the DBEs, their willingness to perform the work in the particular district, and their possession of the necessary workforce and equipment are also factors in the overall determination. The analysis requires the exercise of discretionary judgment by an engineer in the highway district and the district's EEO officer, a knowledge of DBE prior experiences and work history, and the unified directory. Based upon the analysis, the district's estimating engineer and EEO Officer established proposed contract goals.

Henry Gray was the IDOT employee who set the DBE goals on the contract,

which are then approved by the FHWA, IDOT's Bureau of Small Business Enterprises ("SBE"), the Bureau of Design and Implementation Engineer, the Bureau Chief and the IDOT District Engineer. Dunnet Bay disputes that occurred in this instance.

Initially, for the January 2010 letting, Gray calculated the DBE goal for the Eisenhower project to be 8%. When goals were first set on the Eisenhower, taking into account every item listed for work, the maximum potential goal for DBE participation for the Eisenhower project was 20.3%. Eventually, an overall goal of approximately 22% was set.

General contractors bidding on a highway construction contract are not informed of the individual pay items deemed by the Department to be DBE eligible.

### (4) Contractors' Good Faith Efforts

Under the IDOT DBE Program Document, the "obligation of the bidder/offeror is to make good faith efforts" either by meeting the goal or documenting those good faith efforts. When the bid is submitted, the bidder must certify that it met the DBE goal and if it did not meet the DBE goal, the bidder must so state, ask for a modification of the goal, and provide good faith effort documents to show why the goal was not met.

In order to demonstrate good faith efforts, a bidder must show that "all

necessary and reasonable" steps were taken to achieve the contract goal.  IDOT has

identified non-mandatory, non-exhaustive factors for this analysis, including:

a)      soliciting DBE companies through attendance at pre-bid meetings, advertising, or providing written notice;

b)      selecting economically feasible portions of the work for DBE performance;

c)      providing information to DBE companies;

d)      negotiating in good faith with interested DBE companies;

e)      not rejecting DBE companies as unqualified without sound reasons based upon a thorough investigation;

f)      assisting DBE companies in obtaining bonding, lines of credit, or insurance;

g)      assisting DBE companies in obtaining necessary equipment, supplies or materials; and

h)      using the services of available minority/women organizations.

IDOT maintains a "Bidders' List," also known as a "For Bid List."

"Prequalified prime contractors are automatically included in the list."  With regard

to subcontracting, DBEs typically will not submit quotes to general contractors who

are not on the "For Bid List."   A Bidder must submit to IDOT with the bid its

Disadvantaged Business Utilization Plan indicating that the bidder has sufficient DBE participant commitments or has made good faith efforts to obtain those commitments.

If IDOT determines that a bidder has not met the goal and has not shown good faith efforts, IDOT will notify the bidder that its bid is non-responsive and explain why good faith efforts were not found. A bidder that has not met the contract goal and has been found to have failed to exert good faith efforts may request administrative reconsideration of the determination by an IDOT official who had no role in the original determination that the bidder did not make good faith efforts. A written decision by the reconsideration officer must be issued, which explains the "basis for finding that the bidder did or did not meet the goal or make adequate good faith efforts to do so." *See* 49 C.F.R. § 26.53(d)(4).

## D. Eisenhower Expressway Project, Dunnet Bay's Bid and Rejection

### (1) Eisenhower Contract

In 2009, IDOT determined that it would put out a bid for a construction project for a portion of Interstate 290, which is also known as the Eisenhower Parkway, and is located in Cook County, Illinois.

On December 4, 2009, IDOT issued invitations for bids for four federally funded contracts for construction work on the Eisenhower Expressway (also known

as I-290) in Cook and DuPage Counties. One of those contracts is identified as Contract No. 60I57 (also identified as Item Letting No. 228). Using the process previously described for the establishment of utilization goals, IDOT initially established a DBE utilization goal of 8% for Contract No. 60I57.

On December 10 or 11, Hannig issued orders to withdraw the invitation for bids for Contract No. 60I57. Prior to issuing that withdrawal order, Hannig was informed that Governor Quinn's office wanted the Eisenhower Expressway construction projects held due to dissatisfaction with the DBE participation numbers.

IDOT increased the DBE utilization goals for the Eisenhower projects to a weighted average of 20%. The specific DBE utilization goal for Contract No. 60I57 was raised from 8% to 22%. The Bureau of Small Business Enterprises did not review the revised Eisenhower DBE goals.

A revised notice of letting/invitation for bids, dated January 5, 2010, was issued by IDOT. The letting date remained January 5, 2010.

### (2) IDOT's Failure to Include Dunnet Bay on the For Bid List

As previously noted, IDOT maintains a "Bidders' List" or "For Bid List" identifying all approved, prequalified bidders on every item on a letting. The Department updates the For Bid List as necessary.

With respect to Contract No. 60I57, the final For Bid List was published on

IDOT's website on January 14, 2010.  Even though Dunnet Bay was an approved, prequalified bidder for Contract No. 60I57, IDOT failed to include Dunnet Bay on the For Bid List.

### (3) Project Estimates

The program estimate of project costs is set by IDOT when it establishes its annual program, which is the list of projects that are going to be let during the fiscal year.  The program estimate is based on the best information available at the time the program is established.  The engineer's estimate is a very detailed analysis of all the work items, the average price of each of the work items and the total of all of those expenses.

The program estimate indicates whether there is money in IDOT's budget to pay for the construction project.  The engineer's estimate should indicate if the contractor made a fair bid.  Christine Reed distinguished between the program estimate and engineer's estimate because bid analysis requires a review of both.  Bids are measured against the engineer's estimate to see if the contractor gave a reasonable bid.  Bids are measured against the program estimate to make sure there is enough money in the budget.

### (4) Small Business Initiatives

Small business initiatives are small contracts that are let by themselves to give

DBEs an opportunity to submit bids to serve as their own prime contractor instead of always having to be a subcontractor. The small business initiative program is open to non-minority and minority contractors for bidding.

The Division of Highways had reserved $7 million worth of work from the four main Eisenhower contracts to create small business initiative projects and to balance the work in fiscal year 2010. If the work was added back into the prime contracts, it would increase the DBE participation goal. IDOT claims this would serve to get the DBE participation goals close to 20 percent. Dunnet Bay acknowledges it would increase participation though in a race-conscious manner. DBE participation that IDOT receives on small business initiative contracts is not counted towards IDOT's race-neutral DBE participation.

### (5) Dunnet Bay's Bid and Alleged Good Faith Efforts

On January 15, 2010, Dunnet Bay submitted to IDOT its bid for Contract No 60I57. Among other things, Dunnet Bay's bid listed 158 pay items by description, quantity, and price. Dunnet Bay's total bid price for Contract No 60I57 was $10,548,873.198.

Dunnet Bay submitted with its bid its DBE Utilization plan, noting that it planned to meet the 22% DBE utilization goal, but identified $871,582.55 of subcontracting, or 8.26 of its bid, for DBEs.

On January 11, 2010, IDOT convened at a Boys and Girls Club in Chicago a mandatory pre-bid meeting for all prime contractors interested in bidding on one of the Eisenhower projects. On behalf of Dunnet Bay, one of its two owners, Tod Faerber, attended the mandatory meeting. The purpose of the meeting was to give prime contractors an opportunity to discuss with DBEs subcontracting opportunities in light of the increased DBE utilization goals set by IDOT. Faerber spoke with several DBE contractors. At the mandatory meeting, political material supporting State Senator Ricky Herndon was distributed to attendees, including Faerber.

In addition to attending the mandatory meeting, Dunnet Bay undertook other good faith efforts to meet the utilization goal for Contract 60I57. As noted above, Dunnet Bay provided a description and documentation of those efforts to IDOT with its bid. Those efforts included:

a) advertising with DBE networking organizations: Black Contractors United, Chicago Minority Business Development Council, Chicago Urban league, Cosmopolitan Chamber of Commerce, Federation of Women Contractors, Hispanic Contractors, Latin American Chamber of Commerce, Small Contractors Network, the Illinois Hispanic Chamber of Commerce, and the Women's Business Development Center;

b) delivering faxes on January 4, 2010, to DBE companies;

c) following-up by telephone calls on January 11, 12, and 13, 2010, with DBE companies previously solicited; and

d) posting subcontracting opportunities on Dunnet Bay's website.

Dunnet Bay's outreach efforts included using IDOT's unified directory of certified

DBEs to identify possible DBEs for certain pay items. As part of its good faith efforts, Dunnet Bay sent a fax indicating in which areas it was seeking subcontractor prices. In fact, Dunnet Bay had developed its own list of 453 DBE subcontractors from the IDOT unified directory whom Dunnet Bay routinely successfully contracted DBE goals on other objects. The methodology had been successful on past projects as Dunnet Bay was not among the contractors who often sought DBE waivers. Dunnet Bay also used its website to advertise subcontracting opportunities.

With regard to Contract No. 60I57, Dunnet Bay solicited 796 companies, 453 of which were certified DBEs listed in IDOT's unified directory, or 57% of all contacts were to DBEs. Of the 453 DBEs contacted by Dunnet Bay, 12% or 54 of them informed Dunnet Bay that they would provide a quote for Contract No. 60I57; 7% were unsure what they would do; 23% advised that they were not interested; 33% did not answer solicitations or return phone calls; 20% had no contact information or were no longer in business; and 5% asked not to be contacted again.

Although Dunnet Bay from 2007 through 2012 used IDOT's supportive services, it did not do so in preparing its bid for Contract No. 60I57. The goal of IDOT's supportive services program is to provide assistance that fosters opportunities for IDOT's DBE firms, including free services for prime contractors doing business with IDOT.

Although Dunnet Bay occasionally contacted the Bureau of Small Business Enterprises, it did not do so before submitting the bid in this case. The Bureau of Small Business Enterprises will tell a contractor what areas it used for setting the DBE goals if asked. Although it had used the Contractors Marketplace website prior to the January 15, 2010 letting, Dunnet Bay did not use that website in connection with its bid for Contract No. 60I57.

Dunnet Bay's documentation does not indicate that contractors who said they were not interested were called. For example, American Asphalt Company informed Dunnet Bay that it would not quote. In the alphabetical listing of contractors, there is no indication that a call was made to American Asphalt Company, although there are indications other contractors were called.

Tod Faerber testified that if a contractor said it bid but did not send in a quote, then Dunnet Bay might not have followed up with a phone call. Follow-up calls were made on a case-by-case basis.

Dunnet Bay's good faith efforts did not indicate any attempts to assist DBE's in obtaining bonding, lines of credit, or insurance as required by the recipient or contract. Its good faith efforts did not consist of any efforts to assist interested DBEs in obtaining necessary equipment, supplies, materials, or related assistance or services.

Dunnet Bay received no response from its outreach to minority/women community and contractor organizations, which was the typical response received. There is no indication that Dunnet Bay changed its outreach to minority/women community organizations to receive a more effective response. Dunnet Bay did not provide documents suggesting that it attempted to use the services of local, state, or federal minority/women business assistance offices as part of its documentation of good faith efforts.

Dunnet Bay did not provide documents indicating that it attempted to use any other organization to provide assistance in the recruitment and placement of DBEs as part of its documentation of good faith efforts.

The Department projected that it would be able to achieve a 4.12% DBE participation through race neutral means, leaving 18.65% DBE participation that would be met using contract goals.

Dunnet Bay's outreach to potential subcontractors, including DBEs, *i.e.*, contacting and following-up with the subcontractors, customarily takes three employees, working full time, one week to accomplish. With respect to Contract No. 60I57, Dunnet Bay received ten quotes from DBE subcontractors shortly after 10:00 a.m. bid opening on January 15, 2010, including DBEs. If Dunnet Bay had received those DBE subcontractor quotes earlier, it would have achieved a 22.43% DBE

utilization. At least one of the quotes from DBEs to Dunnet Bay arrived late as a direct result of IDOT's failure to include Dunnet Bay on the For Bid List.

Contract No. 60I57 is a federally funded contract. The invitation for bids for the January 15, 2010 letting stated that the letting is subject to and governed by the rules of IDOT adopted at 44 Illinois Administrative Code 650 and 44 Illinois Administrative Code 660, and by the provisions of the invitation. The invitation for the January 15, 2010 letting provided instructions to bidders, which directed as follows: "Read the following instructions carefully. Failure to follow these instructions carefully and the rules may result in the rejection of your bid. The Department reserves the right to reject any and all bids, to waive minor or immaterial irregularities, informalities or technicalities, to advertise for new bids, or to request confirmation or clarification from any bidder regarding a bid."

The FHWA and Ray LaHood, the United States Secretary of Transportation, expressed concern about states not reaching the DBE goals as established by the disparity studies. The FHWA indicated it would like to see participation opportunities increased.

At the bid opening on January 15, 2010, Dunnet Bay's bid was the lowest received by IDOT for Contract No. 60I57. Although its low bid was over IDOT's estimate for the project, it was within an awardable range. However, Gary Hannig

testified it was not true that Dunnet Bay would normally be awarded the contract because the bid was over IDOT's estimate.

Dunnet Bay's bid on the Eisenhower was 0.73 percent below the engineer's estimate. It was 16% over the project estimate. Dunnet Bay claims its bid was rejected solely because it did not meet certain arbitrarily set goals. It alleges the amount had nothing to do with the rejection of the bid.

F.H. Paschen/S.N. Nielsen was the second low bidder for Contract No. 60I57 with a bid of $10,634,968.81 and projected DBE participation of 22%. Albin Carlson and Areatha Construction, a joint venture, were the fourth low bidder for Contract 60I57 with a bid of $11,427,873.98 and projected DBE participation of 40%.

Regional Engineer O'Keefe, whose authority included District 1, the district in which the construction was to take place, recommended the award of Contract No. 60I57 to Dunnet Bay.

IDOT alleges that no one in the Governor's office asked that IDOT hold off on advertising the Eisenhower until the Governor's office was satisfied that IDOT maxed the DBE participation numbers. Hannig decided a second look was necessary for the Eisenhower DBE goals and the Governor's office agreed with that decision. Hannig testified he did not mean to say, in an email to Reed and O'Keefe, that the Governor's office had inquired about holding off on advertising the Eisenhower. Rather, he

spoke to Lafleur in the Governor's office and told her he would like to take a second look at the project.

IDOT alleges that a decision to have a weighted average of 20% for the DBE goals for the Eisenhower was made after determining that the goals could be raised to that level within the federal law. After the Director of Highways determined that the Eisenhower projects could have goals with a weighted average of 20%, the projects were going to be returned to the letting whether the Governor's office agreed with that decision or not. Hannig did not intend to go with a 20% goal notwithstanding the numbers. IDOT had to be able to support the numbers. Dunnet Bay disputes the foregoing allegations.

E. IDOT's Rejection of Dunnet Bay's Bid and Reconsideration

In a letter dated January 22, 2010, IDOT informed Dunnet Bay that it is IDOT's "preliminary determination that [Dunnet Bay has] not demonstrated a good faith effort to meet the DBE goal as required by DBE Special Provision." SBE did not consider and evaluate a bidder's good faith efforts as submitted with the bid for the January 15, 2010 letting and thereafter. SBE (not IDOT) decided to preliminarily reject as non-responsive all bids where the DBE utilization goals had not been achieved notwithstanding the demonstrated good faith efforts so those efforts could be evaluated in their totality.

Dunnet Bay alleges its bid for Contract No. 60I57 was rejected as non-responsive solely because it did not meet the DBE utilization goal and not because its bid price was over IDOT's price estimate. The Department claims the rejection was because Dunnet Bay did not utilize all good faith efforts to secure DBE participation. Moreover, Christine Reed recommended the project be rebid because it was over the project estimate, and Hannig always followed her recommendation. IDOT contends there is no evidence the recommendation would not have remained the same even if the bid was consistent with the DBE goal.

A reconsideration meeting was convened on January 25, 2010 by IDOT at Dunnet Bay's request. Hannig appointed IDOT Chief of Staff William Grunloh, a former Democratic State Representative, to serve as reconsideration officer. This was the first reconsideration meeting in which Grunloh participated. IDOT alleges that, upon his appointment as reconsideration hearing officer, Grunloh made himself aware of what the requirements were and the federal regulations and guidelines that are part of the process. Grunloh reviewed all of the guidance that USDOT published concerning good faith efforts to meet DBE goals prior to the reconsideration hearing. However, Dunnet Bay contends that Grunloh did not act in a manner consistent with federal law.

Dunnet Bay contends its reconsideration was the first to be held after Hannig

directed that DBE utilization goals be increased and that waivers or goal modifications would not be granted, or at least, more difficult to obtain. IDOT disputes this allegation on the basis that Grunloh was the final decision-maker for administrative reconsideration and no one from IDOT instructed him to refuse to grant waivers of the DBE participation goals for contractors who have made good faith efforts to secure DBE participation. IDOT acknowledges Hannig did not want for waivers to be a common practice. Moreover, Christine Reed told the regional engineers to do their jobs well because the Secretary was not interested in entertaining waivers as part of his administration. At a meeting with the AGC, Hannig said that waivers were not going to be an acceptable part of his administration unless it was absolutely, positively appropriate.

Carol Lyle, Deputy Director of IDOT's Office of Business and Workforce Diversity, also attended the reconsideration meeting on behalf of IDOT. Lyle had served as the principal technical support employee for IDOT's DBE program since 1993. Lyle has personally reviewed hundreds of IDOT contracts on the issue of a contractor's good faith efforts.

The Department states that to assist Grunloh in preparing for the reconsideration hearing, an employee in Lyle's office would have given him a packet with the information that Dunnet Bay supplied the utilization plan, any other

documentation Dunnet Bay had on the good faith efforts it had provided, and information about other bidders on that particular item. Before his first reconsideration hearing, Grunloh read the section pertaining to reconsideration hearings, made himself aware of what supportive services were available from IDOT, and learned about what some of the possible outreach ideas could be. Dunnet Bay claims this information is immaterial because Grunloh made the decision solely on the basis of the alleged no-waiver policy announced by Hannig.

Tod Faerber attended the reconsideration meeting on behalf of Dunnet Bay. Faerber told Grunloh that Dunnet Bay was not included on the "for bid" or "bidders list." The "for bid" or "bidders list" is a document that is put out by Design and Environment or Division of Highways that shows who is a plan holder and who is anticipated to bid on a project. It is a tool that is put out by IDOT to assist people to know who your competition was going to be and who could bid with you. Grunloh thought it was a possibility that subcontractors did not submit bids to Dunnet Bay because it was not listed on the bidders list. At the reconsideration hearing, Dunnet Bay wanted to show its good faith and that Dunnet Bay would have made the goal if it had not been left off the for bid list.

At the reconsideration meeting, Dunnet Bay did not amend its DBE utilization plan. Rather, Dunnet Bay provided additional documentation and explanation to

confirm its pre-bid efforts, as previously described. Dunnet Bay's process of contacting subcontractors by phone and fax to solicit bids occurred before IDOT left Dunnet Bay off the for-bid list.

Dunnet Bay contends that after the reconsideration meeting, Lyle believed Dunnet Bay had exercised good faith efforts as described in the federal regulations and perceived no shortcomings in its efforts. Lyle recommended to Grunloh that Dunnet Bay be awarded Contract No 60I57. IDOT claims these allegations are immaterial because Bill Grunloh was the reconsideration hearing officer. IDOT also disputes the allegation, stating that the major reason Lyle thought Dunnet Bay made good faith efforts was because it was off the bidder's List, which is not listed in the federal regulations as a factor to be considered in assessing good faith efforts. Moreover, Lyle believed Dunnet Bay could have gotten assistance from supportive services and it could have contacted SBE or the EEO officer.

Dunnet Bay alleges that on January 25, 2010, after the reconsideration meeting, Faerber visited Hannig in Springfield. Hannig told Faerber that he was under pressure to not grant any DBE waivers. IDOT claims that whether Hannig said this is immaterial because Grunloh, as reconsideration hearing officer, made the determination without any input from Hannig.

On or about February 2, 2010, Hannig called Faerber and informed him that

Dunnet Bay's bid was being rejected because it failed to meet the DBE goal. Hannig told Faerber that IDOT would not grant a waiver of the DBE goal but, because Dunnet Bay was left off the for-bid list, they were going to re-bid rather than award to the second lowest bidder.

Bill Grunloh denied Dunnet Bay's reconsideration of its good faith efforts to secure DBE participation and affirmed the rejection of its bid as non-responsive. Grunloh stated that, in making this determination, he considered the factors set out in 49 C.F.R. Pt. 26 App. A.

Dunnet Bay asserts Grunloh never provided it with an explanation for the finding that Dunnet Bay did not exercise good faith efforts and never advised what other actions it should have taken to adequately make good faith efforts. IDOT claims the allegation is immaterial because Grunloh did, in fact, determine that Dunnet Bay did not exercise good faith efforts based on the federal criteria. Moreover, IDOT decided to rebid the project, which mooted the reconsideration without any prejudice to Dunnet Bay.

Grunloh concluded that Dunnet Bay failed to exercise good faith efforts because it failed to contact IDOT or IDOT's vendor for supportive services and because other bidders were able to reach the DBE goals. The Department had never advised bidders that a mandatory element for a determination of good faith efforts was

contacting IDOT or its supportive services bureau. However, IDOT notes that effectively using the services of state minority/women business assistance offices is within the federal guidelines to be considered when considering good faith efforts. *See* 49 C.F.R. § 26 Appx. A(h).

IDOT alleges that after Grunloh made his decision that Dunnet Bay did not make good faith efforts to achieve the DBE goal and therefore the bid was rejected, he had a conversation with Hannig to tell the Secretary his decision. Grunloh testified that he told Hannig the decision was based on the fact that Grunloh thought Dunnet Bay could have done a better job utilizing some of the supportive services offered by IDOT and that the second, third, and fourth bidders were able to reach the goal while Dunnet Bay did not come close to the goal. Dunnet Bay disputes the allegation and alleges Grunloh did not make the decision based upon legitimate factors.

Grunloh and Hannig also discussed the fact that Dunnet Bay's name was left off the for bid list. Grunloh recommended that the project be re-advertised and re-let. After rejecting Dunnet Bay's low bid, IDOT decided to re-let the contract. Even though Dunnet Bay reached the DBE utilization goal on the re-letting, it was not the low bidder.

IDOT alleges that Grunloh never consulted with Hannig concerning what the outcome of a reconsideration hearing should be. Moreover, no one instructed Grunloh

to refuse to grant waivers of the DBE participation goals for contractors who have made adequate good faith efforts to secure DBE participation, an allegation that Dunnet Bay disputes.

At the February 18, 2010 re-letting of Contract 60I57, Dunnet Bay submitted a bid of $10,199,793.45, with 23.18% DBE participation, which was the third lowest bid. Dunnet Bay's bid was as aggressive on the re-bid of the Eisenhower as it was on original bid. Dunnet Bay did not do anything differently in the February special letting to secure DBE participation.

At the re-letting of Contract 60I57, Albin Carlson & Co. was the low bidder with a bid of $9,637,998.74 with projected DBE participation of 22.7 percent. Albin Carlson is not a DBE.

On March 4, 2010, Grunloh granted a waiver of the DBE participation goal for K-Five Construction for Contract No. 63335.

### F. DBE Program and Administrative Changes on Eisenhower Projects

### (1) Decision to raise goals

On December 10, 2009, Gary Hannig sent an email to Reed and O'Keefe stating:

> The Governor's Office has asked that we hold off advertising the Eisenhower until they are satisfied we have maxed our minority participation numbers. So put on hold for now but am interested in what this delay may mean for the project.

IDOT disputes the allegation to the extent it suggests Hannig wanted to maximize the minority participation only, rather than maximizing the DBE goal. According to IDOT, the context suggests that Hannig meant he wanted to maximize the DBE goal. As previously noted, there is no separate minority goal. Goals were to be met through use of DBE contractors, not minority contractors.

Increasing participation goals on State contracts was part of the Governor's mission for more inclusion in State procurement. In fact, Governor Quinn personally emphasized to top IDOT management that DBE participation was a huge priority for him and his administration.

### (2) Darryl Harris's interview

As the Director of Diversity Enhancement in the Office of the Governor since November 2009, Darryl Harris was responsible for carrying out the vision of Governor Quinn to include minorities and females in State procurement practices. In an interview with the Capital City Courier that was published in January 2010, Darryl Harris stated with respect to the Eisenhower Expressway projects:

> I can tell you one of the greatest successes that we have so far is that we have a project in the Chicago area called the Eisenhower Highway Project, which is a $900 billion dollar project. Traditionally, goals in the past were set around 6 or 8 percent. This administration can go on record that our goal is 20 percent, with one stage of that project being 30 percent for minority-owned business. Already you can see that the Governor is committed to providing opportunities for minorities and women . . . .

The general contractor now has to show evidence of who their subcontractor is and the arrangement for that particular subcontractor to do work. The Governor remains steadfast on a no waiver policy. This has been a practice in [the Capital Development Board] for several years. So, now we're encouraging the Department of Transportation to also have a no-waiver policy. . . .

As I said before, I spent a lot of time at the Department of Transportation, and I feel that the fruits of my labor paid off. We have goals now that are higher than any previous administration . . .

I kind of talked about that previously, but our no-waiver policy is just that. You have to meet it.

IDOT disputes the foregoing allegation and claims that, immediately after the article was published, Darryl Harris stated that he did not mean what he said when he said "no waiver policy." Instead, he meant that a waiver could be granted when appropriate. IDOT further contends the fact is immaterial because Harris testified that, at the time the article was published, he had not discussed the alleged "no waiver policy," whatever its meaning, with IDOT.[3] IDOT claims there is no evidence that Harris exercised any actual authority over IDOT's procurement decisions.

Harris was not Christine Reed's supervisor. Reed reminded Hannig that a no waiver policy was not possible. Reed testified that she and Hannig were both

_____

[3]Although IDOT also objects to the statement on the basis of hearsay, the Court finds it is admissible under Rule 801(d)(2)(A). The Court further concludes the statement has sufficient guarantees of trustworthiness to consider and notes that IDOT had an opportunity to depose Harris.

concerned about the implications of Harris's statements that the Governor had increased the goals on the Eisenhower contracts to 20% with one project being 30%. The federal rules are very specific in how goals are set.

Harris had a view on how IDOT could set goals for projects funded only with State funds but Hannig informed Harris that IDOT's attorney advised that was not allowed, and if Harris did not like it he could talk to the Governor. Dunnet Bay disputes this allegation and claims that Hannig sought permission from Harris on goals setting waivers and contract awards. Moreover, Dunnet Bay asserts Hannig also sought to have Harris be part of the waiver process.

### (3) Communications regarding diversity issues

Both before and after the January 15, 2010 letting for the Eisenhower Expressway projects and the publication of the Harris interview, Hannig and other senior officials in the Governor's Office frequently spoke and exchanged emails on diversity issues, including the DBE goals on the Eisenhower Expressway projects. On September 14, 2009, Kristi Lafleur, the Deputy Chief of Staff in the Governor's office and also Hannig's principal contact, sent an email to Hannig stating, "We had an action plan from IDOT on increasing the DBE numbers . . . I think we need an overhaul for the program and need to announce a new program."

Hannig responded to Lafleur by email, stating in part, "I do agree an overhaul

of this program is in order." IDOT disputes the allegation and states that Hannig

testified in the email he may have been referring to the federal government needing

to overhaul that program and that he did not recall calling for an overhaul of the

program. The Department further claims the allegation is immaterial because the

information has no bearing on the issues in this case. On September 17, 2009, Hannig

sent an email to Lafleur and Jack Lavin, then Governor Quinn's Chief Operating

Officer, providing a description of the goal setting process under the federal rules. He

stated, "Obviously we need better results within federal law."

In an email dated November 16, 2009, Harris requested information about

IDOT DBE initiatives, stating in part, "Per our conversation, the project of particular

interest is the Eisenhower Expressway as we have had inquiries as to the contracting

and workforce goals that will be placed on the project." In an email dated November

20, 2009, Hannig provided Harris information on the expected DBE goals for the four

Eisenhower Expressway projects. After praising Harris's knowledge and enthusiasm,

Hannig stated, "I think working together we can get a great deal of positive change

done here at IDOT."

In an email dated December 11, 2009, Hannig informed Grunloh and Reed of

Harris's request for certain information and directed the level of the DBE goals for the

Eisenhower projects, stating, "Also we need to get the Eisenhower up to 20% minority

participation and back on the schedule next week." IDOT disputes this allegation to the extent it suggests Hannig only wanted to increase minority participation. It is clear he was referencing the DBE goal.

IDOT alleges that on December 11, 2009, there was a meeting with Christine Reed, John Fortmann, Henry Gray, Gary Hannig, Kristi Lafleur and Darryl Harris regarding what DBEs were considered as part of the review process, if there could be additional DBEs considered as part of the review process, and if there could be additional work items included as potential DBE opportunities. Dunnet Bay disputes that IDOT staff had any discretion regarding whether additional work items could be classified as DBE eligible.

At the meeting, the individuals discussed a list of what could potentially be considered DBE eligible and whether or not the Division of Highways needed to go back and take a second look as to whether or not those items could be included for a DBE goal. Division of Highways was asked to return some of the work that had been broken out as small business initiatives to the prime contracts in order to be able to increase DBE participation opportunities.

Dunnet Bay claims that on December 11, 2009 Hannig directed IDOT staff to raise the minority participation, not DBE participation, on the Eisenhower construction projects to 20%. IDOT contends that the materials cited by Dunnet Bay

establish only that minority participation should be raised on the Eisenhower construction projects to 20%. It does not provide that DBE participation should not be increased. IDOT further asserts this is immaterial because the DBE goal was increased to a weighted average of 20% and there was no separate minority goal.

In an email dated December 13, 2009, from Reed to Hannig and other IDOT officials, Reed partially explained the DBE goal setting process:

> The maximum participation for the contracts ranges from 15.5-21.3 percent. . . .
>
> I would be remiss if I did not provide a historical perspective. As with the Eisenhower, there was intense pressure to guarantee minority participation on the reconstruction of the Dan Ryan [Expressway]. . . . At one point, FHWA got very concerned that we were not following the federal process for goal setting and required us to send all of our documentation on goals . . . They wanted to make sure we were not arbitrarily setting DBE goals.
>
> Later that day, Reed sent an email saying that the Division of Highways had

separated out $7 million worth of work from the four main contracts to create Small Business Initiative projects and to balance the work in fiscal year 2010 but if the work was added back into the prime contracts, it would increase the DBE participation goal. Reed knew that adding the Small Business Initiative work back into the prime contracts would not make a 20% goal possible but IDOT would get closer to that.

In December 2009 and January 2010, John Fortmann was acting Bureau Chief of Land Acquisition and the Engineer of Program Development. As Program

Development Engineer, Fortmann was involved in the process of setting the maximum goal that the EEO officer would take and make his judgment.

On December 14, 2009 at 10:52 a.m., Fortmann emailed Christine Reed advising her of goals for the four Eisenhower Projects of 16% for 60I57, 9% for 60G51, 10% for 60G52, and 20% for 60G53. The DBE goals reported by Fortmann were based on the EEO officer's determination that there were available DBE contractors. As of December 14, 2009 at 10:52 a.m., the maximum DBE goals were 25.72% for 60I57, 13.08% for 60G51, 18.87% for 60G52, and 26.54% for 60G53. On December 14, 2009 at 1:45 p.m., Henry Gray emailed increased goals as a result of adding pavement patching to the existing DBE goals to Fortmann. Dunnet Bay disputes the foregoing allegations and claims that the goals were first mandated by Hannig and the Governor's office.

In his email, Gray reported the DBE goals as 22% for 60I57; 14% for 60G51; 19% for 60G52; and 31% for 60G53. In a meeting with Hannig, Fortmann was told that the Governor's office wanted them to do their best to meet a 20% DBE goal.

On December 14, 2009, Harris sent an email to Lavin, Lafleur, and other officials in the Governor's Office. That email included a report of his activities regarding IDOT's DBE program. The report addressed concerns raised by a women's interest group and a black interest group over goals on a Mississippi River bridge

project. Harris described the "Resolution" in his report, "The discussion concluded with [a] willingness to drop their opposition to split goals on the . . . project if, IDOT fully implements, enforces and duplicates the Capital Development Board's no waiver policy."

A meeting was held on December 14, 2009 to discuss the Eisenhower and DBE goals on the Eisenhower. Gary Hannig, Bill Grunloh, Christine Reed, Ellen Schanzle-Haskins, Larry Parrish, John Fortmann, Henry Gray, and Bill Frey attended the December 14, 2009 meeting.

At the December 14, 2009 meeting, the following issues were discussed: Darryl Harris's requests in a December 11, 2009 email, the best way to provide the requested information, the DBE goal items for the Eisenhower, the potential DBE goal items for the Eisenhower, and if there were any mechanisms to increase minority participation opportunities on the Eisenhower contracts. Dunnet Bay disputes the issue of whether there were mechanisms to increase minority participation was discussed, claiming that the issue of increasing minority participation was mandated by the Governor's office and Hannig.

Generally, there was a discussion at the meeting about looking at the collar county DBEs to see if they would come into the city to do work and taking another look at the work items to see if there were other opportunities for DBE participation.

In an email dated December 15, 2009, from Reed to Hannig and other senior

IDOT officials, Reed advised of the original and revised goals:

Original Goals
60G51 – 8% ($3.2 million)
60I57 – 8% ($845,000)
60G52 – 8% ($2.26 million)
60G53 – 10% ($2.47 million)

These goals were established on *conventional practices* . . . .

Revised Goals
60G51 – 14% ($56 million)
60I57 – 22% ($2.3 million)
60G52 – 19% ($5.4 million)
60G53 – 31% ($7.6 million)

The weighted average of these contracts is 20 percent. Originally, we had separated the landscaping work out of these contracts with the intent of advertising them as SBI (Small Business Initiative) Contracts – similar to the Dan Ryan Reconstruction SBI Contracts. We have added that work back into these four main contracts and assigned a goal for those work items. We also contacted the City of Chicago, and they placed a goal on pavement patching. We talked to the FHWA and they concurred that this is a legitimate item for DBE goal credit. Historically, IDOT has not used pavement patching for DBE goal credit because it controls the prime contractor's paving schedule which is key to getting the work done on time. If the prime is not done by the completion date, we assess liquidated damages against them. They will look to the subcontractors to recoup their losses if the subcontractors did not meet their deadlines.

Hannig had no understanding what Reed meant in the email when she said, "These

goals were established based on conventional practices."

On December 15, 2009, Hannig forwarded to Harris and Lafleur Reed's email of the same date explaining the revised goals and asking, "Is it ok to proceed?" The same day, Harris responded via email to Hannig's question by saying, "This clearly shows Governor Pat Quinn's willingness to provide opportunities to all people of our diverse state." Lafleur responded by email on the same date congratulating Harris, "You did a great job Darryl."

In an email dated December 30, 2009, Harris advised Hannig and other senior IDOT officials, that they all concur with IDOT's determination that the DBE participation goals for two major programs, including High Speed Rail, should be increased to 30%.

With regard to the publication of the Harris interview with the Capital Courier in January 2010, Hannig sent an email, dated January 15, 2010, to Grunloh and other senior IDOT officials stating, "No waivers will be a big change." Hannig testified he was very upset about the article, in that it suggested IDOT would be engaged in conduct not allowed by law. Hannig stated his response was a cross between sarcasm and contempt.

In an email dated January 20, 2010, from Hannig to Harris and Lafleur, Hannig advised of Dunnet Bay's low bid on Contract No. 60I57:

> The fourth project has 4 bidders. The low bidder is over budget but close in dollar amounts but is the only bidder to miss the dbe goals.

> Under our rules since the lowest bidder is close to our pre bid estimate, he would normally be given the award if he could show a good faith effort to meet the dbe goals and was granted a waiver by idot. If idot rules he did not make a good faith effort idot could award the contract to the next lowest bidder or rebid the project.

Despite the email, Hannig testified it was not true that Dunnet Bay would normally be awarded the contract since the bid was over IDOT's estimate.

In a series of emails dated January 26, 2010 and February 8, 2010, among Hannig, Harris, Lafleur and other officials from IDOT and the Governor's Office, an "IDOT No Waiver Policy" was addressed in light of Harris's interview. In an email dated January 26, 2010, Jack Lavin stated in part, "The information as presented makes it sound absolute." Hannig responded in an email dated January 28, 2010:

> Darryl, this was item 228 [Contract No. 60I57] on this list of Eisenhower projects we shared with you. Your recommendation was to reject and accept the next bid. After speaking with my legal counsel and chief engineer, we decided to rebid.

On February 5, 2010, Hannig explained in an email to Harris, that, with respect to Item 228 after rejecting Dunnet Bay's bid, "We have a special bid opening for this project in a few weeks." Harris responded to Hannig by email dated February 8, 2010 regarding the special bid opening, "The DBE goals should remain aggressive like the original projects."

In addition to the Governor's Office, Hannig met frequently with members of the General Assembly's Black Caucus, who expressed to him their view that DBEs

were not getting sufficient state work. On January 21, 2010, John Webber, IDOT's Director of Communications, prepared a letter for Hannig to send to the members of the Legislative Black Caucus and Legislative Latino Caucus. The letter informed the minority caucuses that: "Governor Quinn recently ordered an increase in DBE goals from 8 percent to 20 percent on upcoming I-290 resurfacing contracts in Chicago, to direct more contracts to DBE firms." Hannig approved that statement.

IDOT asserts that, with respect to goal waivers and modifications, Hannig told Harris that IDOT would follow the federal law, that IDOT would be bound by the federal law and that IDOT was interested in any ideas that were legal. However, it had no interest in going beyond the law. Hannig advised that a no waiver policy was not allowed under the federal rules. He told Harris that federal law provided there must be a waiver process. Hannig further stated that a no waiver policy was not allowed under federal law and that IDOT would not implement a policy that was clearly in violation of federal law. Dunnet Bay disputes these allegations and claims Hannig did not act in accordance with what he told Harris.

On January 26, 2010, Jack Lavin in the Governor's office sent an email to Hannig, Harris, and Schanzle-Haskins in regard to a letter received from the Illinois Road Builders Association complaining about statements made by Harris in the Capital City Courier about a no-waiver policy.

Ellen Schanzle-Haskins responded, stating that IDOT is not violating federal law. She explained that the DBE program requires the Department to consider and grant waivers of any low bid prime contractor's failure to meet DBE goals based on the good faith efforts of the prime contractor to make the goal. She further stated that IDOT has and does grant waivers when appropriate. Dunnet Bay disputes that IDOT acted in accordance with Schanzle-Haskins' letter.

Harris responded to Schanzle-Haskins and stated that the Road Builders were interpreting the "no waiver" policy as an absolute when it is not. He stated that simply means that a thorough review of the waiver will be pursued and not just granted upon request. Dunnet Bay again asserts that IDOT did not act in accordance with that statement.

### (4) December 23, 2009 Phone Conference

At some point, Hannig decided that the DBE utilization goals on the Eisenhower Expressway projects needed to be maximized. Hannig directed the IDOT staff to raise DBE utilization goals to 20%.

A telephone conference call occurred on December 23, 2009 with Hannig, other senior IDOT officials, including Grunloh and Reed, regional engineers and their staff from the district, and district EEO officers to address goal maximization. Participation by the district engineers and district EEO officers in the conference call

was made mandatory by Hannig.

During the conference call, Hannig led the conference and did most of the talking. The focus was minority participation in IDOT construction contracts. During the conference call, Hannig directed the IDOT staff to be more aggressive in establishing DBE utilization goals and to set them at the maximum level. Hannig also emphasized the need to have much better communications between the technical staff and the EEO officers and the need to make sure that the goals were set at a maximum. Hannig directed that the Eisenhower Expressway projects DBE utilization goal would be 20%. Moreover, during the conference call, Hannig directed that there should not be any IDOT construction contracts with a zero or low goal.

Hannig was also concerned about waivers and goal modifications and wanted the districts to be well aware of his concerns. Almost immediately after the December 23, 2009 meeting, Hannig announced he would be personally reviewing DBE goals so that everyone in IDOT would understand it is an important decision.

### (5) Alleged no-waiver policy

In early March of 2009, Reed met with Hannig to discuss what she should tell her regional engineers at an upcoming meeting. When Reed was asked exactly what Hannig said she testified, "I don't recall his exact words, but his message was very clear that waivers would not be a part of his administration." Reed acknowledged that

message was a common theme throughout his administration. In that same conversation, Hannig also gave Reed instructions on what to tell the Illinois Asphalt Pavers Association (IAPA), a major constituent group of IDOT, in an upcoming speech Reed was scheduled to give to IAPA. Reed's notes state, "IAPA speech, no waivers." IDOT states Reed's notes mean that she was to tell IAPA that waivers would not be the practice of Hannig's administration. In the context, Reed understood Hannig's instructions concerning "waivers" to refer to requests for DBE goal modifications prior to the award of construction contracts.

Reed did not deliver the message using the exact words as instructed by Hannig. Instead, she told the regional engineers the following, "I told them that they had better do their jobs and do them very well because the Secretary was not interested in entertaining waivers as part of his administration." Although she did not recall the exact words used in the IAPA speech, Reed's advice to IAPA was roughly as follows:

> They would have been along the lines of minority participation is very important to the administration. That achieving goals set on highway construction projects was essential. That waivers would be, requests for waivers would be closely scrutinized and would be very difficult to get.

Carol Lyle worked in the Bureau of Small Business Enterprises from 1986 until her retirement in 2011. Not only was Lyle the principal technical support of IDOT since 1993 with respect to interpretation of DBE procedures and requirements, she

also is very familiar with the constitutional limitations of the program. One of her responsibilities in the positions she held in 2009 and 2010 was to ensure that the DBE program was administered in accordance with the law. From 2007 to 2010, Lyle was personally involved in reviewing goal waivers or modification requests based upon good faith efforts.

Dunnet Bay had sought and received a modification on September 11, 2008. The DBE goal of 18% was reduced to 16.3%.

In calendar year 2009, there were 58 pre-award modifications requests submitted, 32 of which were approved. The remaining 26 modification requests were resolved by the contractor meeting the goal.

In calendar year 2010, there were 35 modification requests. Twenty-one requests were granted, while 14 were denied. That year, there were 1037 total items with DBE goals and only 35 requests to modify the goals.      Dunnet Bay alleges recommendations on goal waivers were sent to Hannig for approval. IDOT disputes the allegation to the extent it suggests that DBE goal waivers are always subject to the approval of the Secretary. IDOT further notes that Bill Grunloh was the final decision maker for the Department on goal waiver requests and he was authorized to reverse contrary decisions by the Secretary.

Dunnet Bay asserts Lyle would make recommendations on goal waivers by

giving them to her supervisor, Parrish, who in turn if he agreed, would forward them to Hannig. IDOT contends this fact is immaterial because the cited testimony was describing the process from April 2009 to November 2009. The DBE process would change beginning with the January 15, 2010 letting.

Dunnet Bay further alleges Lyle was concerned in 2009 that her supervisors lacked sufficient respect for the constitutional limitations of the DBE program. She had trouble getting her supervisor, Parrish, to act on DBE waiver requests, or to forward waiver requests to Hannig. Parrish told her he was under pressure not to approve goal modification requests. IDOT contends the allegation is immaterial because Lyle's testimony was limited to the time prior to Dunnet Bay's bid on the Eisenhower Expressway. Moreover, it is merely an example of one employee who disagreed with aspects of the program.

Dunnet Bay cites another example of when Hannig denied a goal waiver and further stated, "No, we have to do better!" Lyle then responded to her supervisor, "It's not a matter of 'doing better,' it is a matter of being in compliance with the federal regulations, e.g., good faith efforts period." Lyle told one of her employees with respect to Hannig and Parrish, "They are making me crazy." At her deposition, Lyle described what was making her "crazy":

> Not giving consideration to the efforts a contractor made to meet the goal. They were looking at the actual goal itself and what the

contractor's participation was. For example, if the goal were 20 percent and a contractor came in at significantly lower than 20 percent, they were looking at the number versus the effort.

IDOT contends the cited testimony is immaterial because it was specifically limited to issues arising prior to the DBE program at issue in this case.

Dunnet Bay alleges that Lyle was frustrated with the lack of respect certain individuals had for the constitutional limitation on the race conscious programs. After a meeting with Hannig and others concerning a new program mandated by state law she wrote an email to Parrish in which she outlined in detail, with case citation, the constitutional limitation on race-based programs. IDOT notes that the same concerns were shared by its chief legal counsel. Moreover, it claims that the way a constitutional program was ultimately developed was to revise the legislation.

During the conference call on December 23, 2009, Hannig also addressed the subject of DBE waivers. Hannig stated that he did not want to be put in a position where he was forced to decide between goals attained and waivers. Hannig explained his comments on waivers during that telephone conference and his views on waivers in general as follows:

> Q. [Mr. Gower] Was there any discussion at the December 23 teleconference meeting about DBE waivers or modifications and your feelings about those?

A.   [Mr. Hannig] I think that we talked in terms of we need to do our job right.  That we don't need to have a bunch of waivers, in other words.

Q.   What did you say to convey that idea?

A.   We simply need to do our job, right.  You have to do – if the job was done properly and the low bidder was able to meet the goals, because the goals were set high, but within the law could be attained, then the process would work just fine.

Q.   If you set DBE goals at the maximum level –

A.   Allowed by law.

Q.   – allowed by law, would you expect to see more waiver or modification requests as a result?

A.   No.

Q.   So, when you increased the goals to the maximum percent as you say allowed by law, you would not expect to see any increase in goal modifications or waiver requests?

A.   Not necessarily. . . .

Hannig continued:

Q.   [Mr. Corrigan] In your meeting of the 23rd when you discussed the fact that you didn't want to see a bunch of waiver requests –

A.   Uh-huh.

Q.   – what did you think that the staff could do to ensure that there weren't waiver requests?

A.   They could get it right.  They could find achievable goals within the law that were high.  In other words, a waiver is in some ways

a – when we grant a waiver, it is, in some ways, in some cases an acknowledgment by the agency that the goals were too high. That they were not achievable, and we grant a waiver.

One of the participants in the conference call, Maruffo, contemporaneously took notes of the statements made during the conference call. One of Maruffo's notes states: "Tony at D-1 – maximized goals, no waivers." The term "D-1" refers to District 1 of IDOT. IDOT disputes the allegation to the extent it is submitted to support the alleged "no waiver" policy. IDOT alleges the comment regarding "maximized goals, no waivers" was made by someone from District 1 at the December 23, 2009 conference call. The individuals stated there was a goal setting that resulted in no waiver requests and the person described how they broke out or added in some projects in order to make that work.

During the conference call, Hannig addressed the employment of the district engineers and EEO officer with regard to maximizing DBE goals and waivers. He explained his comment on their job as follows:

Q.     [Mr. Gower] Did you say or do any – did you say anything in the meeting that suggested that if the EEO officers didn't do what you had outlined to be their job, they would no longer have that job?


A.     [Mr. Hannig] I suggested that they simply need to do their job, that I was trying to impress upon them that it was important that they do this part of the job. That perhaps, perhaps under previous administrations this was not an important part of the jobs, but under this administration, under my administration at I.D.O.T I

50

considered it to be an important part of the job, and I wished them to simply do their job. That's all I ever expected from my employees.

Q.      And what precisely did you say to the EEO officers to convey those concepts to them?

A.      That this was a very important part of what we need to do, that you need to do your job.

Q.      And did you suggest to anyone – I am going to ask the same question again, it is just a yes or no, did you suggest to anyone that if they didn't do their job, they wouldn't have that job anymore?

* * *

A.      I think I made it clear that we all have to do our job.

* * *

Q.      Did you say anything at the meeting that was designed to convey to the EEO officers that if they didn't maximize the DBE goals, that they would have their job anymore?

A.      The purpose was to make sure that they understood that they needed to do, under the law, what was allowed to set the goals as high as the law allows. That was part of their job. I wanted to make sure that they understood that it was simply part of their job and that we all need to do our job.

Q.      Did you tell them they would be fired if they didn't do their job?

A.      I am not even sure if I can fire them. They may very well be in the union. I don't know.

Q.      Did you tell them that they would be discharged if they didn't do their job?

A.     I don't recall that I told people they would be discharged or fired.

On December 28, 2009, Lyle sent an email to Parrish in which she recommended that one of the topics for discussion in a regularly scheduled meeting with Hannig should be "possibly training on Federal Regulations so there is some understanding of regulatory constraint." Lyle described the concern that prompted her to send the email as follows:

Q.     [Mr. Gower] Were you concerned as of December 28th, 2009 that Secretary Hannig wasn't fully appreciative of the constitution limitations on the DBE Program?

A.     [Ms. Lyle] I think I had a concern regarding those above me and their knowledge of how the program had been administered previously.

Q.     Did you have concerns that some of the actions being taken might be outside the law and cause problems for the program?

A.     Yes.

Q.     Did one of those concerns relate to maximization of the DBE goals?

A.     Yes.

Q.     Did another one of those concerns relate to how the goal modification approval process was administered and how those decisions were made?

A.     I am trying to recall at this point.

Q.     Well, if you look back to Exhibit 7, which was the, I think it is the PT Ferro E-mail, that email was dated December 9, 2009.

A.    The answer would be yes.

### (6) Review of goals and awarding of contract

Dunnet Bay alleges that at a pre-letting meeting called by IDOT for contractors on January 6, 2010 in District 8 (St. Louis Metro East area), IDOT's District 8 EEO officer, Lee Coleman, reportedly stated to the contractors that no waivers would be granted for the January 15, 2010 letting. IDOT disputes the allegation and notes that Coleman denies making the statement. Moreover, Coleman would not have had any job duties in considering requests for waivers.

The Department alleges that although Henry Gray heard rumors that Secretary Hannig did not want to approve waivers, the granting of waivers could not be avoided. Dunnet Bay disputes the allegation.

IDOT began to search for ways to justify Hannig's directive to set 20% DBE goals on the Eisenhower projects. The methods reviewed by IDOT include expanding the geographic areas to determine DBE availability, assign pay items as DBE eligible which had previously been reserved for the general contractor, and designate pay items set aside for small businesses as DBE eligible.

The scope of work for Contract No. 60I57 included "4.24 miles of milling, patching, HMA surface, bridge repairs, drainage improvements, striping and other work on I-290." There was discussion about whether pavement patching could be

included as a DBE item. Pavement patching involves cutting out deteriorated, faulted concrete and replacing it with steel and new concrete.

Historically, pavement patching and payment marking were not deemed DBE eligible pay items. Pavement patching had been part of the "critical path" work, *i.e.*, work that has to be properly sequenced to complete a project when scheduled. IDOT states that pavement patching would now be used for DBE goals. The fact that IDOT might have risked delays in the project is immaterial because federal regulations do not prohibit this. *See* 49 C.F.R. § 26.1, *et seq*.

Because the majority of work on the Eisenhower Expressway projects was bridge rehabilitation and resurfacing, pavement patching was critical to meeting the completion date. Reed was concerned that designating pavement patching as DBE eligible would interfere with timely completion of the Eisenhower projects and would create public safety considerations. Because pavement marking a Chicago expressway is very specific and difficult and requires special equipment, Reed was concerned whether DBEs could be used for pavement marking. It was a choice made by the Department to not include pavement patching as a DBE-eligible item. It was not a federal rule.

IDOT's small business initiatives program was a program where certain pay items were reserved or set aside for small business enterprises without regard to the

racial composition of the small business enterprises.  Because DBEs are often small business enterprises, IDOT's small business initiative was designed to give minority enterprises an opportunity to act as prime contractors.  In order to set the directed DBE goal on the Eisenhower projects IDOT designated, as DBE eligible, pay items which were previously set aside for small business enterprises, such as landscaping work.

Hannig also decreed in December 2009 that all State funded projects scheduled for the January 15, 2010 letting should be re-reviewed to ensure the DBE goals were maximized and that the review should be completed the next business day.  To meet that directive, IDOT EEO officers outside of the Chicago area, among others, added goals to what had been small business initiative projects; assigned goals to projects where the decision had previously been made to have no goals, and to attach DBE goals because DBEs were likely to be bidders on the projects; or the EEO officers simply revised their prior judgment to justify a DBE goal increase.

Beginning in January 2010, Hannig ordered that all contractor bids that did not meet the goals were to be rejected, notwithstanding any good faith effort.  IDOT would convene a reconsideration meeting only for a bidder who had requested a goal modification when it submitted its bid and if it requested reconsideration.

IDOT was advised that its practice of rejecting bids as non-responsive and not

offering contractors who failed to meet the goal and did not check the box requesting a modification because, for example, the contractor made a math error, is a violation of 29 C.F.R. § 29.53(d) and contractors who fail to meet the DBE goal must be given an opportunity for reconsideration. The Department contends this allegation is immaterial because Dunnet Bay does not claim this situation happened to it.

IDOT alleges that, when the Eisenhower projects were rebid, it provided more lane closures, which allowed the contractor more time to work unimpeded by traffic and also allowed contractors to make adjustments to their maintenance of traffic, so when the contractor had lane closures the maintenance of traffic requirements were not as tight. By making those two changes, IDOT expected bids to be reduced by a significant amount. Because of the reduced costs of the bids received and the addition of extra work specifications, IDOT saved approximately $1.3 million through acceptance of the lowest responsive bid at the second letting. Dunnet Bay alleges its bid was rejected solely because it did not meet arbitrarily set goals and these financial considerations are of no consequence.

IDOT asserts that in the original bids for the Eisenhower, one of the reasons that the bids were higher than anticipated was because IDOT was very restrictive on the number of allowed lane closures. Eisenhower Contract 60I57 and three of the four Eisenhower Expressway projects were re-advertised for bids for the February 18, 2010

special letting.  Ellen Schanzle-Haskins told Hannig that Dunnet Bay was left off the bidders list; that it was not fair to Dunnet Bay, the other bidders or to the DBEs themselves if Dunnet Bay was left off the bidders list; and that IDOT should absolutely not award the contract to the second low bidder, but should instead rebid the whole thing so that Dunnet Bay got a fair shot at the contract again.  Dunnet Bay contends its bid was rejected because it did not meet arbitrarily set goals and these financial considerations are of no consequence.

In March 2010, Hannig was personally reviewing the DBE goals for construction projects before they could be advertised.  Within the last eight years, other than its bid on the Eisenhower project on January 15, 2010, Dunnet Bay has never had a bid rejected as non-responsive.

When Dunnet Bay submitted its bid, it did not know it had been left off the for-bid list.  The documentation Dunnet Bay received after submitting its first bid for the Eisenhower indicated there were sufficient DBEs in the area to meet the goal.  One of the partners of Dunnet Bay admitted that the DBE goal was realistic.  On IDOT projects, Dunnet Bay has never failed to submit a bid because it was unable to reach the DBE goal.  Dunnet Bay does not claim it was discriminated against on any construction contracts except the Eisenhower contract.

IDOT alleges Dunnet Bay does not claim that any similarly situated business

enterprises were treated more favorably than Dunnet Bay on either the January 15, 2010 letting for the Eisenhower construction project or the February 18, 2010 special letting that the Eisenhower construction project that is at issue in this case. Dunnet Bay disputes the allegation and contends that Albin Carlson, a non-DBE, was awarded the contract because it had adequate DBE participation, and thus was treated differently on the basis of race.

From 2007 to 2012, Dunnet Bay's work with IDOT totaled $202 million, resulting in profits close to $20 million.

### III. DISCUSSION

Dunnet Bay contends that IDOT departed from federal regulations and its own federally-approved written program to engage in race-based decision-making, which resulted in harm to Dunnet Bay. Although it was the low bidder for the construction project, Dunnet Bay did not meet what it alleges was the arbitrarily inflated goal for participation of DBEs despite its good faith efforts, thereby denying Dunnet Bay the opportunity to compete for the contract on a level playing field due to race. Because it asserts IDOT's actions cannot survive strict scrutiny, Dunnet Bay claims it is entitled to summary judgment on liability.

IDOT contends it followed all applicable guidelines in handling the DBE program. Because it did not abuse its federal authority in administering the program,

IDOT alleges the DBE program is not subject to attack. Moreover, IDOT asserts that neither the rejection of Dunnet Bay's bid nor the decision to rebid the project was based on its race or that of its owners.

IDOT further contends that because Dunnet Bay is relying on the rights of others (i.e., small businesses operated by white males) and it was not denied an equal opportunity to compete for government contracts, Dunnet Bay lacks standing to bring a claim of racial discrimination. Even assuming there was an Equal Protection violation, IDOT asserts Dunnet Bay cannot show that, but for the violation, it would have been awarded the contract. Additionally, the Department claims Dunnet Bay cannot show there is an ongoing violation which would warrant injunctive relief.

A. Legal standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The Court construes all inferences in favor of the Plaintiff. *See Siliven v. Indiana Dept. of Child Services*, 635 F.3d 921, 925 (7th Cir. 2011). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted).

Because summary judgment "is the put up or shut up moment in a lawsuit," a

"hunch" about the opposing party's motives is not enough to withstand a properly supported motion. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor. *See id.*

When a court is considering cross-motions for summary judgment, it must "construe all inferences in favor of the party against whom the motion under consideration is made." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998).

B. Intentional discrimination based on race

Dunnet Bay, a white-owned contractor, alleges IDOT made impermissible, race-based decisions denying it the right to compete for IDOT business on an equal footing, in violation of the Equal Protection Clause, 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 2000d (Title VI of the Civil Rights Act) and Section 5 of the Illinois Civil Rights Act of 2003, 740 ILCS 23/5. Title VI forbids racial discrimination by recipients of federal grants. *See* 42 U.S.C. § 2000d; *Williams v. Wendler*, 530 F.3d 584, 586 (7th Cir. 2008).

Race-based discrimination that violates the Equal Protection Clause also violates § 1981 and Title VI. *See Gratz v. Bollinger*, 539 U.S. 244, 275-76 (2003). The same standards generally apply when the plaintiff is alleging intentional

discrimination under § 1981 and the Equal Protection Clause. *See Friedel v. City of Madison*, 832 F.2d 965, 971 (7th Cir. 1987); *Melendez v. Illinois Bell Telephone Co.*, 79 F.3d 661, 669 (7th Cir. 1996).

"Title VI proscribes only those racial classifications that violate the Equal Protection Clause." *Levin v. Madigan*, 692 F.3d 607, 619 (7th Cir. 2012). Title VI prohibits only intentional discrimination. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 178 (2005). An equal protection violation involves the "invidious classification of persons aggrieved by the state's action" and requires a showing of "intentional or purposeful discrimination." *Nabozny v. Podlesny*, 92 F.3d 446, 453-454 (7th Cir. 2002). To establish liability for an equal protection violation, a plaintiff "must show that the defendants acted with a nefarious discriminatory purpose, and discriminated against him based on his membership in a definable class." *Id*. at 453 (internal citation omitted).

Section 5 of the Illinois Civil Rights Act of 2003, which prohibits discrimination against a person in a government program based on race and other classifications, *see* 740 ILCS 23/5, was not intended to create new rights but was instead enacted to establish a state law remedy for discrimination that was covered by Title VI. *See Illinois Native American Bar Association v. University of Illinois*, 368 Ill. App.3d 321, 327 (1st Dist. 2006).

**(1)**

All entities receiving funds from the FHWA must have a DBE program which meets requirements. *See* 49 C.F.R. § 26.21(a). In order to qualify as a DBE, the company must be 51% owned by persons who are socially and economically disadvantaged. *See* 49 C.F.R. § 26.5. Members of any racial group or gender can qualify as socially and economically disadvantaged for these purposes. *See Northern Contracting, Inc. v. Illinois*, 473 F.3d 715, 717-18 (7th Cir. 2007). There is a rebuttable presumption that women, Black Americans and members of certain other groups are socially and economically disadvantaged. *See* 49 C.F.R. § 26.67. However, the ownership interest of an individual must be disregarded if the person has an individual net worth above a certain level (in excess of $750,000 at the time of the contract in question). *See id*. Additionally, a business does not qualify as a DBE if its yearly gross receipts are in excess of $22.41 million. *See* 49 C.F.R. § 26.65.

IDOT was obligated to set an overall goal for DBE participation on federally assisted contracts. *See* 49 C.F.R. § 26.45. One way to comply is to exercise good faith in administering the program and in attempting to meet the goal. *See* 49 C.F.R. § 26.47. One way in which to meet the goal is to place DBE goals on contracts with subcontracting possibilities. *See* 49 C.F.R. § 26.51. If a contract has goals, a general contractor must demonstrate that it has obtained sufficient DBE participation to meet

the goal or has made adequate good faith efforts to meet the goal.  *See* 49 C.F.R. § 26.53(a).  "If the bidder/offeror does document adequate good faith efforts, you must not deny award of the contract on the basis that the bidder/offeror failed to meet the goal."  49 C.F.R. § 26.53(a)(2).  The term "good faith efforts" is expanded upon in Appendix A to the rules:

> This means that the bidder must show that it took all necessary and reasonable steps to achieve a DBE goal or other requirement of this part which, by their scope, intensity, and appropriateness to the objective, could reasonably be expected to obtain sufficient DBE participation, even if they were not fully successful.

49 C.F.R. Appendix A to Part 26, § I ("Appendix A").  The rules require IDOT to review the bid for the purpose of "making a fair and reasonable judgment whether a bidder . . . made good faith efforts" by considering "the quality, quantity and intensity" of the efforts.  *See* Appendix A, § II.

The regulations recommend a number of non-mandatory, non-exclusive and non-exhaustive actions when considering a bidder's good faith efforts to obtain DBE participation.  These include:

> A. Soliciting through all reasonable and available means (e.g. attendance at pre-bid meetings, advertising and/or written notices) the interest of all certified DBEs who have the capability to perform the work of the contract.  The bidder must solicit this interest within sufficient time to allow the DBEs to respond to the solicitation.  The bidder must determine with certainty if the DBEs are interested by taking appropriate steps to follow up initial solicitations.

B. Selecting portions of the work to be performed by DBEs in order to increase the likelihood that the DBE goals will be achieved. This includes, where appropriate, breaking out contract work items into economically feasible units to facilitate DBE participation, even when the prime contractor might otherwise prefer to perform these work items with its own forces.

C. Providing interested DBEs with adequate information about the plans, specifications, and requirements of the contract in a timely manner to assist them in responding to a solicitation.

*See* Appendix A, § IV. Other considerations include negotiating in good faith with DBEs while exercising good business judgment; not rejecting DBEs as unqualified without sound reasons following a thorough investigation; and "[e]ffectively using the services of minority/women community organizations; minority/women contractors' groups; local, state, and Federal minority/women business assistance offices; and other organizations as allowed on a case-by-case basis to provide assistance in the recruitment and placement of DBEs." *See id.*

The regulations also provide the State may consider the ability of other bidders to meet the goal:

In determining whether a bidder has made good faith efforts, you may take into account the performance of other bidders in meeting the contract. For example, when the apparent successful bidder fails to meet the contract goal, but others meet it, you may reasonably raise the question of whether, with additional reasonable efforts, the apparent successful bidder could have met the goal. If the apparent successful bidder fails to meet the goal, but meets or exceeds the average DBE participation obtained by other bidders, you may view this, in conjunction with other factors, as evidence of the apparent successful

bidder having made good faith efforts.

Appendix A, § V.  Given that the factors cited in Appendix A are non-exhaustive, it is also permissible to consider a bidder's track record in evaluating its good faith efforts.

Only after the State entity, in this case IDOT, determines that the apparent successful bidder has failed to meet the requirement of good faith efforts, the bidder must be given the opportunity for administrative reconsideration.  *See* 49 C.F.R. § 26.53(d).  If the decision on reconsideration is a finding of inadequate efforts, the State recipient must be given a written explanation regarding the basis for the finding.  *See* 49 C.F.R. § 26.53(d)(4).

## (2)

"[G]overnment actions to remedy past racial discrimination – actions that are themselves based on race – are constitutional only where there is a 'strong basis in evidence' that the remedial actions were necessary."  *Ricci v. DeStefano*, 557 U.S. 557, 582 (2009) (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989)).  A government program that uses racial classifications is subject to strict scrutiny.  *See Northern Contracting,* 473 F.3d at 720.  Therefore, the program must be "narrowly tailored to serve a compelling governmental interest."  *Id.*

A state entity such as IDOT implementing a congressionally mandated program

may rely "on the federal government's compelling interest in remedying the effects of past discrimination in the national construction market." *Id.* at 720-21. In these instances, the state is acting as an agent of the federal government and is "insulated from this sort of constitutional attack, absent a showing that the state exceeded its federal authority." *Id.* at 721. Accordingly, any "challenge to a state's application of a federally mandated program must be limited to the question of whether the state exceeded its authority." *Id.* at 722. Therefore, the Court must determine if IDOT exceeded its authority granted under the federal rules or if Dunnet Bay's challenge is foreclosed by *Northern Contracting.*

IDOT's overall aspirational goal of 22.77% DBE was set in 2005 and was approved in *Northern Contracting.* 473 F.3d at 719, 722-23. Dunnet Bay contends that the contract goals with respect to the Eisenhower project were arbitrarily set and were not in compliance with federal regulations. IDOT asserts contemporaneous documents show otherwise. The goal was set at 20% on the four projects, including a 22% DBE goal with respect to Contract No. 60I57.

The undisputed facts show that after initial theoretical DBE goals were set, Henry Gray was the IDOT employee who set the DBE goals on the contract, which were then approved by the FHWA, the Bureau of Design at IDOT, the Implementation

Engineer, the Bureau Chief, and the IDOT District Engineer.[4]  Bureau of Design estimators put together theoretical or potential goals based on a percentage basis pursuant to the amount of work for individual contracts.  Gray would obtain the information from the Bureau and examine the document to determine the county where the work would be performed under the contract and determine what certified DBEs were ready, willing and able in that particular area.  Eventually, Gray found that the maximum potential goal for DBE participation for the Eisenhower project was 20.3%.  After re-evaluating the goals, a goal of 22.2% was set for the contract.

Although Dunnet Bay contends that IDOT did not employ a reasoned analysis in setting contract goals and instead based the goal on political considerations, these undisputed facts show that IDOT did in fact employ a thorough process before arriving at the figure.  Additionally, because the federal regulations do not specify a procedure for arriving at contract goals, it is not apparent how IDOT could have exceeded its federal authority.  Any challenge on this factor fails under *Northern Contracting*.

---

[4]Dunnet Bay claims that contrary to IDOT's standard DBE good faith procedures, the Bureau of Small Business Enterprises did not review the revised Eisenhower DBE goals and had no role in their development.  IDOT contends this is not contrary to its good faith procedures.  Moreover, Small Business Enterprises was not involved in the review of DBE goals for expedited projects.  Additionally, because there is no federal or any other requirement that Small Business Enterprises review goals, the Court concludes this would constitute a violation of federal law.

Based on the foregoing, the Court concludes there is no basis for finding that the DBE goal was arbitrarily set or that IDOT exceeded its federal authority with respect to this factor.

**(3)**

Dunnet Bay also contends that IDOT employed a "no-waiver" policy, by refusing to grant waivers of DBE goals for contractors who made good faith efforts to meet contract goals. Dunnet Bay asserts this amounted to an inflexible quota or set aside, in violation of 26 C.F.R. § 26.43.

The undisputed material facts establish that there was not a "no-waiver" policy at IDOT. Certainly, there is significant evidence that Alex Hannig might not have wanted to approve many waivers. Waivers may well have been discouraged for political reasons. Darryl Harris, the Director of Diversity Enhancement in the Office of the Governor, encouraged a "no-waiver" policy and said that was the Governor's desire as well.

The undisputed facts establish that Christine Reed advised Hannig that a no waiver policy was not possible because it violated the law. Hannig in turn told Harris that IDOT would follow and be bound by federal law, which requires the existence of a waiver process.

It is apparent there was not a no-waiver policy because a waiver was in fact

granted in connection with the January 15, 2010 letting–the same letting at issue in this case. It is undisputed that on March 4, 2010, Bill Grunloh granted a waiver of the DBE participation goal for K-Five Construction Corporation on Contract No. 63335. Upon determining that K-Five had made adequate food faith efforts to secure DBE participation, Grunloh granted a modification of the DBE goal from 10% to 7.9%. The record further establishes that a number of modifications were granted before the Eisenhower project and after it.

Dunnet Bay's assertion that IDOT adopted a "no-waiver" policy is unsupported and contrary to the record evidence. Accordingly, despite any political pressure from the Office of the Governor or other entities and regardless of the personal views of the Secretary of Transportation or anyone else, the undisputed facts establish that IDOT did not have a "no-waiver" policy. IDOT did not exceed its federal authority by adopting a "no-waiver" policy. Therefore, any challenge on this factor fails pursuant to *Northern Contracting*.

**(4)**

Dunnet Bay also contends that, in violation of 49 C.F.R. § 26.53(a), IDOT did not determine whether Dunnet Bay's bid made a showing of good faith efforts. It asserts the Department denied the bid because the DBE goal was not met without reviewing Dunnet Bay's alleged good faith documentation, pursuant to 49 C.F.R.

Appendix A to Part 26.

Dunnet Bay contends the reconsideration of its bid was not meaningful. Although Dunnet Bay solicited hundreds of DBEs via faxes and phone calls, attended pre-bid meetings designed to provide outreach to DBEs and contacted appropriate minority and female organizations, it could not meet the DBE goal. However, Dunnet Bay claims this was not due to a lack of good faith efforts. Dunnet Bay alleges the goal was not achieved because of IDOT's own administrative failure in omitting Dunnet Bay from the for bid list. It further notes that Carol Lyle, Deputy Director of IDOT's Office of Business and Workforce Diversity, believed after the reconsideration meeting that Dunnet Bay should be awarded Contract No. 60I57 based upon its good faith efforts to meet the DBE utilization goals.

Dunnet Bay further asserts that IDOT's political appointees decided to manufacture an excuse for its rejection–specifically its failure to utilize the services of IDOT's supportive services vendor. Although this is a factor that may be employed in analyzing good faith efforts, Dunnet Bay claims it is not a mandatory or determinative factor. Moreover, Dunnet Bay contends that this factor has not previously been considered by the Department to be mandatory.

At his deposition, Bill Grunloh was shown the Good Faith Effort Section of the Disadvantaged Business Enterprise Participation special provision. Grunloh was

asked to specify the areas in which he found Dunnet Bay's efforts to be lacking. He had criticisms of Dunnet Bay's efforts with respect to paragraph one, which discusses soliciting through all reasonable and available means the interest of all certified DBE companies that have the ability to perform the work of the contract. Grunloh suggests Dunnet Bay was deficient regarding paragraph three, which discusses providing interested DBE companies with adequate information about the plans, specifications and requirements of the contract in a timely manner to assist them in responding to the solicitation. Additionally, Grunloh pointed to paragraph six, which mentions assisting interested DBEs with obtaining bonding lines and credit insurance; paragraph seven, which discusses efforts to assist in obtaining necessary equipment; and paragraph 8, which encourages effectively using services of various groups to provide assistance in recruitment and placement of DBE companies.

The regulations refer to eight non-exhaustive factors which can be considered in assessing good faith. IDOT asserts that Dunnet Bay provided no documentation that it had performed any of the items, except that it sent a large number of faxes to DBEs, minority/women community organizations and minority/women contract groups stating that Dunnet Bay was bidding certain contracts and was looking for subcontractors. Dunnet Bay followed up by phone with a number of the DBEs. Dunnet Bay notes that it also attended pre-bid meetings. Dunnet Bay contends IDOT

acted in a manner inconsistent with federal law.

The factors to be considered are non-mandatory, non-exhaustive and non-exclusive. A contractor who does not meet the goals "must show that it took all necessary and reasonable steps to achieve a DBE goal." 49 C.F.R. § Pt. 26 App. A. Based on this standard, a reconsideration officer such as Grunloh has significant discretion and will often be called on to make a "judgment call" regarding the efforts of the bidder. Accordingly, it is not surprising that another IDOT official might disagree with the decision.

The Court is unable to conclude that Bill Grunloh erred in determining Dunnet Bay did not make adequate good faith efforts. Perhaps the strongest evidence that Dunnet Bay did not take "all necessary and reasonable steps to achieve a DBE goal" is that its DBE participation was under 9% while other bidders were able to reach the 22% goal. Accordingly, the Court concludes that IDOT's decision on reconsideration of the rejection of Dunnet Bay's bid was consistent with the regulations and did not exceed IDOT's authority under federal law.

Grunloh denied Dunnet Bay's reconsideration of its good faith efforts and affirmed the rejection of its bid as non-responsive. Alex Hannig advised Dunnet Bay of the decision by letter dated February 2, 2010.

To the extent that Dunnet Bay alleges IDOT failed to provide Dunnet Bay with

a written explanation of as to why its efforts were not sufficient, as required by 49 C.F.R. § 26.53(d)(4), the Court is unable to conclude that a technical violation such as that would provide any relief to Dunnet Bay. Additionally, because IDOT rebid the project, Dunnet Bay was not prejudiced by any deficiencies with the reconsideration.

It is also worth emphasizing that because of the decision to rebid the project, IDOT was not even required to hold a reconsideration hearing. The regulations require that the bidder be afforded administrative reconsideration "before awarding the contract." *See* 49 C.F.R. 26.53(d). IDOT states that the project was rebid because the bids were too high and also because it believed it may have tainted the bidding process by leaving Dunnet Bay off the list of bidders for the project. Because the contract was not awarded to the next bidder that did meet the DBE goal, the Court concludes any claim that Dunnet Bay might have had based on § 26.53(d)(1)–(5) became moot when the project was re-bid.

Because the decision on reconsideration did not exceed IDOT's authority under federal law, Dunnet Bay's claim fails under *Northern Contracting*.

C. Whether Dunnet Bay's equal protection rights were violated

**(1)**

IDOT contends that Dunnet Bay lacks standing to raise an equal protection

claim based on race, contending neither Dunnet Bay nor its owners suffered discrimination on that basis. "Standing exists when the plaintiff suffers an actual or impending injury, no matter how small; when that injury is caused by the defendant's acts; and when a judicial decision in the plaintiff's favor would redress that injury." *Brandt v. Village of Winnetka*, 612 F.3d 647, 649 (7th Cir. 2010).

Citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995), Dunnet Bay asserts it is clearly established that a contractor has standing to challenge a DBE program. The Supreme Court held:

> [The Contractor's] claim that the Government's use of subcontractor compensation clauses denies it equal protection of the laws of course alleges an invasion of a legally protected interest, and it does so in a manner that is "particularized" as to [the Contractor]. . . . The injury in cases of this kind is that a discriminatory classification prevent[s] the plaintiff from competing on an equal footing.

*Id*. at 211 (internal quotation marks and citation omitted). The injury was particularized to Adarand because it submitted the low bid to a contractor to perform work on a project, but did not receive the subcontract because the prime contractor received additional compensation for awarding the subcontract to a small business controlled by "socially and economically disadvantaged individuals." *See id*. at 205. Unlike the subcontractor in *Adarand*, Dunnet Bay was not disadvantaged in its ability to compete against a racially favored business. Neither IDOT's rejection of Dunnet Bay's bid nor the decision to rebid was based on the race of Dunnet Bay's owners or

any class-based animus.

Dunnet Bay does not point to any other business that was given a competitive advantage because of the DBE goals. "[I]n the context of a challenge to a set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract." *Northeastern Florida Chapter of Associated General Contractors of American v. Jacksonville*, 508 U.S. 656, 666 (1993). That case involved an ordinance which provided that 10% of contracts were to be awarded to minority or female businesses. *See id.* at 658. Certain contracts were reserved for minority businesses. *See id.* The plaintiff was an association consisting mostly of members who could not bid on those contracts. *See id.* at 659. The Court held that in order to establish standing, a company needed only to "demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Id.* at 666.

The facts here are not at all similar to those in *Northeastern Florida Chapter*, in which the plaintiffs were ineligible to compete for 10% of the contracts. While generally alleging it has standing based on *Adarand*, Dunnet Bay does not cite any cases which involve plaintiffs that are similarly situated to it–businesses that are not at a competitive disadvantage against minority-owned companies or DBEs–and have been determined to have standing. Any company similarly situated to Dunnet Bay

had to meet the same DBE goal under the contract. IDOT cites a number of Supreme Court cases, including *Adarand*, which involve claims that a company was at a competitive disadvantage and/or unable to compete equally with those given preferential treatment. That did not occur in this case.

It is true that a hypothetical DBE might not have had to subcontract work on the Eisenhower project, thereby providing it with a competitive advantage over the other bidders. However, there is no evidence that occurred in this case. Dunnet Bay has not pointed to another contractor that did not have to meet the same requirements it did. In any event, it is doubtful that Dunnet Bay could bring a claim on the basis that another contractor was treated more favorably. Because Dunnet Bay's average gross receipts exceeded $22.41 million in the three years prior to 2010, it would be ineligible to be classified as a DBE and not similarly situated to such a company, even if it were owned by a minority or a woman. *See* 49 C.F.R. §26.65(b).

The Court concludes that Dunnet Bay lacks Article III standing to raise an equal protection challenge because it has not suffered a "particularized" injury that was caused by IDOT. Dunnet Bay was not deprived of the ability to compete on an equal basis.

It appears that Dunnet Bay would also be precluded from bringing this claim pursuant to "prudential" standing requirements. A "plaintiff generally must assert his

own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *see also G&S Holdings LLC v. Continental Cas. Co.*, 697 F.3d 534, 540 (7th Cir. 2012).

Dunnet Bay is attempting to assert a right that might in certain circumstances be invoked by a white-owned small business–for example, if a white-owned small business lost out on a contract to a minority-owned small business because of the DBE program. Based on its profits, Dunnet Bay does not qualify as small business. Accordingly, it lacks standing to vindicate the rights of a (hypothetical) white-owned small business.

In bidding on the contract, Dunnet Bay was not denied the ability to compete on an equal footing. Accordingly, the Court concludes that Dunnet Bay lacks standing to challenge the DBE program based on the Equal Protection Clause.

**(2)**

Even if Dunnet Bay has standing to bring an equal protection claim, the Court concludes IDOT is entitled to summary judgment. In its Second Amended Complaint, Dunnet Bay alleges an equal protection violation as follows:

> 68. The IDOT DBE program, with the unwritten no-waiver and the practice of imposing contract goals not narrowly tailored to address discrimination and not determined to be necessary to meet IDOT's overall goal, for DBE utilization as subcontractors by general contractors in Illinois highway construction contracts on which Dunnet Bay bids, invidiously discriminated against Dunnet Bay and is unlawful on its face,

77

in violation of 42 U.S.C. § 1983 and Dunnet Bay's right thereunder to be free from race discrimination in the solicitation and award of IDOT contracts, including the Contract.

69. Likewise, the IDOT DBE Program, as interpreted, applied, and enforced by IDOT requiring Dunnet Bay to meet DBE goals and to deny Dunnet Bay a waiver of the goals despite its good faith efforts to meet the goal, violates 42 U.S.C. § 1983, and Dunnet Bay's right thereunder to equal protection in the solicitation and award of IDOT construction contracts, including the Contract.

*See* Doc. No. 19, at 18.

The United States Supreme Court has held that a DBE program can be challenged without a showing that the affected group would have been awarded the contract but for the equal protection violation; the group need not allege it would have been awarded the contract in order to obtain standing. *See Northeastern Florida Chapter*, 508 U.S. at 666. "The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id*.

In the Amended Complaint, Dunnet Bay implies that but for the alleged "no waiver" policy and contract goals which were not narrowly tailored to address discrimination, it would have been awarded the contract. As the Court noted earlier, the record establishes that IDOT did not have a "no waiver" policy.

To establish an equal protection violation, a plaintiff must show that the defendant acted with a "nefarious discriminatory purpose," which was based on its

membership in a definable class. *See Indianapolis Minority Contractors Ass'n v. Wiley*, 187 F.3d 743, 752 (7th Cir. 1999) (citation omitted). Because "[t]he gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons," *see id*., it does not appear Dunnet Bay can assert a viable claim. The Court is unaware of any authority which suggests that Dunnet Bay can establish an equal protection violation even if it could show that IDOT failed to comply with the regulations relating to the DBE program. "[T]he regulatory requirements focus on what the states must do, in structuring their programs, to maximize the opportunity of minority businesses to participate in contracts financed with federal funds; the regulations do not confer specific entitlements upon any individuals." *Id*. at 751. Therefore, even if IDOT did employ a "no-waiver policy," such a policy would not constitute an equal protection violation.

In order to support an equal protection claim, a plaintiff would have to establish it was treated less favorably than another entity with which it was similarly situated in all material respects. *See Harvey v. Town of Merrillville*, 649 F.3d 526, 531 (7th Cir. 2011). "The equal protection clause requires similar treatment of similarly situated persons; it does not require things which are different in fact or opinion to be treated in law as though they were the same." *Id*. (internal quotation marks and citation omitted).

Based on the current record, the Court can only speculate whether Dunnet Bay or another entity would have been awarded the contract without IDOT's DBE program. It is unknown what the bid of the F.H. Paschens/S.N. Nielsen, the second lowest bidder, might have been if it had not met the 22% goal. Similarly, it is not known what Dunnet Bay's bid would have been if it had met the 22% goal.

The Court need not speculate as to whether Dunnet Bay or another company would have been awarded the contract under different circumstances. What is important for equal protection analysis is that Dunnet Bay was treated the same as other bidders. Every bidder had to meet the same percentage goal for subcontracting to disadvantaged businesses or make good faith efforts. Because Dunnet Bay was held to the same standards as every other bidder, it cannot establish it was the victim of discrimination pursuant to the Equal Protection Clause. Because Title VI applies only to violations of the Equal Protection Clause," *Levin* , 692 F.3d at 619, Dunnet Bay's claims under Title VI also fail.[5]

---

[5]As IDOT notes, it is also unknown whether the contract would have been awarded if Dunnet Bay was determined to have used good faith to meet the DBE goals. Because Dunnet Bay's bid was over project estimates, it may have been rebid in an effort to lower costs. Additionally, IDOT appears to have carefully considered a number of factors before deciding to rebid the contract. It decided it would not be fair to immediately reject Dunnet Bay's bid after leaving it off the "for bid" list. It also would not have been fair to the other bidders if the bid had been awarded to Dunnet Bay, given the competitive advantage it had by having only 8% DBE participation. If Dunnet Bay had been awarded the contract, the DBEs would also have been denied work because of an error by IDOT. Accordingly, the Department faced a difficult decision and appears to have acted

For the forgoing reasons, IDOT is entitled to summary judgment on Dunnet Bay's claims under the Equal Protection Clause and Title VI.

D. Injunctive relief

For the reasons previously discussed, Dunnet Bay is not entitled to injunctive relief because it has not demonstrated a likelihood of future harm. Additionally, contrary to Dunnet Bay's assertion, the record establishes that IDOT did not have a "no waiver" policy.

## IV. CONCLUSION

For the reasons stated herein, the Court concludes IDOT is entitled to summary judgment. Dunnet Bay lacks standing to raise an equal protection challenge based on race. Even if Dunnet Bay has standing to pursue such claims, IDOT is entitled to summary judgment because Dunnet Bay is unable to show that it would have been awarded the contract in the absence of any violation. Because Dunnet Bay's equal protection claims fail, IDOT is also entitled to summary judgment on the Title VI claims. Any other federal claims are foreclosed by *Northern Contracting* because there is no evidence IDOT exceeded its authority. Additionally, because Section 5 of the Illinois Civil Rights Act of 2003 simply establishes a state law remedy for Title VI violations, *see Illinois Native American Bar Association*, 368

_____

reasonably.

Ill. App.3d at 327, summary judgment is also warranted on Dunnet Bay's state law claims. Finally, Dunnet Bay has not established a likelihood of future harm and is thus not entitled to injunctive relief.

ERGO, the Plaintiff's Motion for Summary Judgment [d/e 154] is DENIED.

The Defendants' Motion for Summary Judgment [d/e 166] is ALLOWED.

Any future court settings are hereby Canceled.

The Clerk will enter Judgment in favor of the Defendants and against the Plaintiff.

ENTER: February 11, 2014

FOR THE COURT:

_s/Richard Mills_
Richard Mills
United States District Judge